ANTONIA RAMOS BUIST, ETC., ET AL., demandantes-recurridos y recurrentes, *v.* LA SUCESIÓN DE LUIS LLORÉNS TORRES, ETC., ET AL., demandados-recurrentes y recurridos.

*Números:* 289 y 290      *Resueltos:* 1 de junio de 1965

*Héctor Ramos Mimoso, Gabriel de la Haba, Juan A. Faría* y *Nicolás Jiménez Torres,* abogados de los demandantes, recurridos y recurrentes; *Rodríguez Ema & Rodríguez Ramón,* abogados del interventor Manuel H. Rossy; *Brown, Newsom & Córdova, Otero Suro & Otero Suro,* abogados de la Sucesión de Luis Lloréns Torres; *Luis Lugo, Luis F. Cuyar* y *Jorge Souss,* abogados de Felipe Segarra y Amelia Boerman.

Sala integrada por el Juez Presidente Interino Señor Pérez Pimentel y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

La controversia en litigio tiene su origen en hechos que ocurrieron el día 29 de octubre de 1919.

(1) El récord nos dice que en ese día, y por escritura Núm. 42 otorgada en San Juan ante el Notario Luis Abella Blanco, los hermanos Ramos Buist, Doña Clemencia, Doña Antonia, Don Jesús y Don León, vendieron a Don Luis Lloréns Torres una finca rústica que se describió así en el documento:

"Finca Rústica: Denominada Monte Rey, radicada en el barrio Monacillos, del término Municipal de Río Piedras. Su cabida es de doscientas veinte cuerdas más o menos, de terreno de vega, poyales, y manglares, equivalentes a ochenta y seis hectáreas, cuarenta y seis áreas y ochenta y seis centiáreas y sus colindancias son las siguientes: por el Norte con el Río de Río Piedras, llamado también Puerto Nuevo; por el Este con el predio segregado que hoy pertenece a Don Luis Ruberto Catala;

por el Sur con el mencionado terreno del señor Rubert; y con la finca que fue de la Sucesión de Don Ramón Gutiérrez del Arroyo y que hoy pertenece a Don José S. Cestero y por el Oeste con la Quebrada Margarita y la Estancia de los hermanos Yriarte, que antes fue del Presbítero Don Manuel Díaz Caneja. Contiene dicha finca un ranchón, un horno de cal y algunas casitas para peones; se halla actualmente en parte sembrada de cañas y algunos pastos; la cruza de Norte a Sur la Carretera Insular que conduce de Santurce por la calle de Cerra a Bayamón, atravesando a esta finca en toda la longitud que hay desde el puente del Río Puerto Nuevo, hasta el de la Quebrada Margarita; y toda es terreno completamente llano a excepción del cerro conocido con el nombre de Monte o Seboruco del Rey."

El traspaso se efectuó por el precio de $10,000 que fueron pagados en el acto, y se hizo constar que la venta se realizaba a precio alzado y no a tanto por unidad de medida o número, y en consecuencia el comprador no tendría derecho a reclamación alguna en caso de que por cualquier motivo resultara menor la cabida del inmueble vendido, ni sería afectada la venta por la mayor o menor cabida del inmueble cualquiera que fuera la mayor o menor importancia del aumento o disminución que resultara.

(2) El mismo día del otorgamiento de la escritura, 29 de octubre de 1919, los vendedores hermanos Ramos Buist, el comprador Don Luis Lloréns Torres y el abogado Don Manuel F. Rossy otorgaron un documento privado suscrito ante el propio Notario Abella Blanco, affidavit 1172, documento éste que origina el pleito y que pasamos a copiar:

### "Convenio Privado

"Los contratantes en el presente convenio privado son de una parte, Don Luis Lloréns Torres acompañado de su esposa doña Carmen Rivero Rodríguez; y de la otra parte el abogado Dn. Manuel F. Rossy y los hermanos Ramos Buist, llamados Don Léon, Don Jesús, Doña Antonia y Doña Clemencia, quienes estipulan el siguiente compromiso:

"1.—Que los firmantes esposos Lloréns Rivero son dueños de la finca denominada Monte-Rey, de doscientas veinte cuerdas

radicada en el barrio de Monacillos de Río Piedras, y que en dicha finca hay un pedazo de terreno de manglares, en la parte Norte de la misma, que pretende sin razón alguna reclamarle el Pueblo de Puerto Rico.

"2.—Que los firmantes hermanos Ramos Buist y el señor Rossy, se comprometen, a ayudar al Sr. Lloréns Torres prestándole toda la cooperación necesaria en la defensa de las dichas acciones que intenta el Pueblo de Puerto Rico; entendiéndose que la ayuda del Sr. Rossy será como abogado y consejero, mientras que la cooperación de los hermanos Ramos Buist ha consistido solamente en suministrarle al Sr. LLORENS TORRES, todos los antecedentes y datos necesarios para su defensa; los cuales antecedentes y datos el Sr. Lloréns Torres confiesa que ya le han sido suministrados por los cuatro firmantes hermanos Ramos Buist.

"3.—En consideración a dicha ayuda o cooperación del señor Rossy y de los hermanos Ramos Buist, el Sr. Lloréns Torres, si tuviese éxito en las dichas acciones del Pueblo de Puerto Rico, por la presente se compromete a *vender o traspasar a los otros comparecientes* la mitad de los expresados manglares que sean objeto de dichas reclamaciones; haciéndose aquí constar que la parte de manglares a que se refiere este contrato se halla situada al Norte del inmueble, en el espacio o perímetro comprendido entre el río Puerto Nuevo, la quebrada Barraco, el Seboruco del Rey y el antiguo caño de la quebrada Margarita, y se fija como precio de dicha venta la suma de UN MIL DOLARES, que los contratantes consideran ser el justo valor de la ayuda o cooperación referida; por cuya cantidad el Sr. Lloréns, acompañado de su esposa, firmará la correspondiente escritura de venta a favor de los otros firmantes en la proporción de una sexta parte para el abogado Sr. Rossy, y las otras cinco sextas partes para los cuatro hermanos Ramos Buist; repitiéndose aquí que dicha obligación de venta, por parte de los esposos Lloréns Rivero, es solamente en el caso de que, por transacción o por sentencia se obtenga éxito en las referidas reclamaciones del Pueblo de Puerto Rico, es decir, en la defensa contra las mismas; y repitiéndose también que este compromiso sólo se refiere a los expresados manglares *objeto de dichas reclamaciones.*

"4.—Se estipula también que en todo tiempo, el Sr. Lloréns tendrá la preferencia en caso de venta o arrendamiento, por parte de los otros contratantes, de la mitad que a ellos corresponde.

"5.—También reconoce el Sr. Lloréns que las maderas del ranchón y caseta anexas pertenencen a don León Ramos.

"Bajo cuyos términos dejan celebrado este compromiso que se obligan a cumplir, firmándolo por duplicado en San Juan a 29 de octubre de 1919. Carmen R. de Lloréns—Manuel F. Rossy —L. Ramos—Antonia R. vda. de Álvarez Torres—Jesús Ramos Buist—Luis Lloréns Torres—C. R. vda. de Buist.

Affivadit No. 1,172—Suscrito este documento ante mí, en San Juan de Puerto Rico, hoy día 29 de octubre de 1919 por los siguientes señores: Don Luis Lloréns Torres y su esposa Dña. Carmen Rivero, ambos mayores de edad, propietarios y vecinos de San Juan; Don Manuel F. Rossy y Dña. Antonia Ramos, mayores de edad, viudos, propietarios y de esta vecindad; y Doña Clemencia Ramos, viuda y Don León y Don Jesús Ramos Buist, mayores de edad, propietarios y vecinos de Bayamón, y casados los dos últimos, a todos cuyos firmantes doy fe de conocer personalmente.—L. Abella Blanco—Notario Público."

(3) Como antecedentes de las transacciones del día 29 de octubre de 1919 el récord revela, según consta de una escritura Núm. 32 de Divisoria otorgada en San Juan el 27 de septiembre de 1919 ante el Notario Luis Abella Blanco por los hermanos Ramos Buist y Don Luis Rubert, que Don Antonio Ramos y Mencos era dueño desde el año 1854 por herencia de su padre de la finca llamada "San Patricio." Según consta del documento y del Registro, en 1881 Don Antonio Ramos tramitó en el Juzgado de Río Piedras una información posesoria que fue inscrita y se le dio a la finca "San Patricio" una cabida de 760 cuerdas más o menos. En 1893 Don Antonio Ramos vendió a Don Leopoldo Cerecedo 680 cuerdas que luego vinieron a ser de Don Luis Rubert, reservándose la parte situada al nordeste de la finca que calculó en 80 cuerdas y que estaba en litigio con el Padre Díaz Caneja. Se dice en la escritura sobre Partición que posteriormente hubo una mensura y se le dio a la finca "San Patricio" una cabida de 900 cuerdas más o menos que quedaron inscritas en el Registro, y se dice también que El Pueblo de Puerto Rico reclamaba unos manglares, sin expresarse su cabida o su ubicación, y

que si por tal causa, o por cualquiera otra resultare menor
la cabida total del inmueble principal, la pérdida no podría
afectar el predio segregado de 680 cuerdas del Sr. Rubert, sino
que sería imputada y afectaría sólo al predio restante de los
hermanos Ramos, que lo habían heredado al fallecer su padre
en 14 de enero de 1894. El aumento de cabida de 760 a 900
cuerdas—140 cuerdas—se acreditó todo a la porción que se
reservó Don Antonio Ramos, aumentando dicha porción de
80 a 220 cuerdas que se describieron como finca "Monte Rey"
en la referida escritura Núm. 32 de Partición con los lindes
y colindancias con que se describe dicha finca en el documento
de venta al Sr. Lloréns Torres, párrafo (1) anterior. Se
expresa en la escritura de Partición que a las 680 cuerdas
del Sr. Rubert se le dio un precio a razón de $44.11-1/2 cada
cuerda y al predio "Monte Rey" de los señores Ramos un
valor global de $9,800 (a razón de $44.54 la cuerda), suma
ésta por la cual se tenía concertado un traspaso a Lloréns.

(4) Como antecedentes, además, de las transacciones del
día 29 de octubre, los hermanos Ramos, el Sr. Lloréns y el
Sr. Rossy habían convenido por escrito, en documento fechado
27 de julio de 1919, que el Sr. Lloréns compraba la finca
Monacillos a razón de $200 cuerda de las que resultaren de una
mensura que ahora se practicara, y que los Sres. Lloréns
Torres y Rossy gestionarían de la Administración Insular la
obtención de los manglares que estaban hacia la parte nor-
deste de la finca en el límite del mar, y la cantidad de tierra
a obtenerse por eso se dividiría entre el comprador Sr. Lloréns
y los vendedores. Los vendedores gestionarían el cumplimiento
de una sentencia ganada al Padre Díaz Caneja para resta-
blecer la colindancia de la finca vendida al verdadero curso
de la quebrada Margarita, y el terreno obtenido por este
cumplimiento se le vendería al Sr. Lloréns al mismo precio de
$200 la cuerda.

(5) En 16 de abril de 1920 El Pueblo de Puerto Rico
interpuso demanda de reivindicación contra Don Luis Lloréns

Torres, pleito civil Núm. 12685 de la anterior Corte de Distrito de San Juan, y le reclamó el dominio de un predio con cabida aproximada de 300 cuerdas poblado de manglares, accesible dicho predio a las altas mareas. En su contestación el Sr. Lloréns alegó entre otras cosas, que la finca "San Patricio" tenía dentro de sus lindes y colindancias una superficie de 1,077 cuerdas, y que al segregarse las 680 vendidas al Sr. Rubert el remanente adquirido por él contenía 397 cuerdas según plano de mensura levantado por el ingeniero Antolín Nin en marzo de 1920 que acompañó a su contestación. Alegó que su finca Monte Rey no colindaba en parte alguna con manglares del Pueblo de Puerto Rico y que su colindancia norte era el Río Puerto Nuevo y la del oeste la quebrada Margarita que dividía el municipio de Río Piedras del de Guaynabo y dicha quebrada desembocaba en el Río Puerto Nuevo a unos 150 metros de su boca.

(6) El pleito se falló el 13 de febrero de 1925. A tenor de toda la prueba documental y oral y de una inspección ocular realizada, concluyó la Corte que la colindancia norte de la finca de Lloréns era el Río Puerto Nuevo sólo hasta el punto en que el mismo desembocaba en la Bahía de San Juan y de ahí en adelante dicha colindancia era la zona de manglares del Pueblo de Puerto Rico dentro de la cual estaba incluida la porción de terreno reclamada, siendo la línea divisoria aquella más alta que marcaran las aguas del flujo y reflujo de la marea, y que siendo así, el título de Lloréns no abarcaba dicha porción.

(7) Apelada la anterior sentencia, caso 3924 de este Tribunal, y desistida la apelación en 12 de febrero de 1931, en igual fecha las partes sometieron una transacción a la Corte de Primera Instancia en virtud de la cual y siguiendo sus términos se dictó otra sentencia en 18 de febrero de 1931 dejando sin efecto la primera y decretando que El Pueblo de Puerto Rico aceptaba que el Sr. Lloréns era legítimo dueño de las 220 cuerdas inscritas en el Registro, según cadena de

458

título comprobada desde el 1815. [1] Se situaron en la sentencia dichas 220 cuerdas desde la quebrada Verraco por el fondo que las separa de la parte de Rubert hasta una línea recta paralela a la carretera insular tirada desde la quebrada Margarita hasta el Río Puerto Nuevo, la cual sería trazada por ingenieros del Departamento del Interior, y desde esta línea el terreno restante al oeste de la misma hasta la Bahía de San Juan quedaba del Pueblo de Puerto Rico y dicha línea sería la colindancia definitiva para las partes y sus causahabientes, entre los terrenos del Pueblo y la finca San Patricio y Monte Rey. Se decretó que El Pueblo de Puerto Rico era dueño de todo terreno excedente situado entre las 220 cuerdas así deslindadas y la Bahía de San Juan. En esta sentencia se describió de nuevo la finca haciéndose constar que por el oeste colindaba con la quebrada Margarita que la separaba de terrenos de los hermanos Iriarte, "y con los manglares del Pueblo de Puerto Rico que se hallan situados entre el Río Nuevo y el cauce actual de la quebrada Margarita." La línea a ser trazada a que hace alusión la sentencia aparece fijada en un plano hecho en diciembre de 1940 por el ingeniero Sr. Carlos Castro Martínez y dicha línea es la colindancia oeste y norte en parte que como se dijo en la sentencia deslindó la finca Monte Rey de todo terreno perteneciente al Pueblo de Puerto Rico. [2]

[1] La Corte en su primera sentencia resolvió considerando la finca San Patricio con la cabida original de sólo 760 cuerdas según la información posesoria y así determinó que el remanente retenido después de la segregación y vendido a Lloréns era sólo de 80, pero ello no fue del todo correcto porque según mensura posterior a la información la finca tenía una cabida de 900 cuerdas inscritas. Se explica así la posición del Pueblo posteriormente en la transacción. De no haber habido error en la reclamación en cantidad de 300 cuerdas, dudamos que el Procurador General de entonces hubiera dispuesto en el pleito de terrenos del Pueblo de Puerto Rico sin la autorización legislativa, o de su superior, el Gobernador.

[2] Tomando como base la quebrada Verraco al fondo de la finca y que es su colindancia con los terrenos segregados de Rubert, la finca Monte Rey se proyecta más bien en dirección del sureste al noroeste según consta tanto del plano del Sr. Nin de marzo de 1920 como del plano de 1940 del

(8) El Sr. Lloréns perdió toda la finca Monte Rey como consecuencia de una deuda hipotecaria que fue ejecutada, y recuperó luego, en virtud de transacción en un pleito instituido por él sobre nulidad de dicha ejecución, algunas porciones de la finca. Por no requerirlo la disposición que hacemos del caso no es necesario que describamos en detalle las porciones recuperadas así como tampoco las múltiples otras transacciones que Don Luis Lloréns Torres y luego sus herederos realizaron con la finca Monte Rey y que causaron la desmembración de dicha finca. La Sala sentenciadora hizo una cuidadosa y detallada exposición de todos esos hechos y transacciones, división y subdivisión de la finca que está de acuerdo con la prueba, a la cual nos remitimos así como a una Certificación del Registro de la Propiedad, Sección Segunda de San Juan, de 15 de diciembre de 1958, admitida en evidencia. Hasta aquí los hechos que precedieron al pleito.

(9) En 18 de marzo de 1952 los hermanos Ramos Buist, Doña Antonia por su cesionario el Sr. Raúl Ramos Mimoso y los otros tres por sus sucesiones, demandaron en la Sala de San Juan del Tribunal Superior a la Sucesión de Don Luis Lloréns Torres, este pleito, en acción que titularon Declaración de Comunidad, Deslinde, División de Comunidad y Reclamación de Frutos y Daños. Alegaron los hermanos Ramos Buist en una primera causa de acción que del total de 220 cuerdas de que se componía la finca vendida al Sr. Lloréns, 137 cuerdas eran terrenos de manglares ubicados dentro de los linderos señalados en el contrato privado de 29 de octubre de 1919, y el remanente (83) era terreno firme no envuelto en el litigio entre El Pueblo y Lloréns Torres; que por la sentencia de 18 de febrero de 1931 se reconoció al Sr. Lloréns el pleno dominio de la totalidad de la finca vendida con una cabida de 220 cuerdas; que en virtud de dicha sentencia y de

Sr. Castro Martínez. Así, el que la colindancia norte mencionada en los distintos documentos en parte fuera la colindancia oeste y el que la colindancia oeste quede también en dirección hacia la Bahía de San Juan al igual que parte de la colindancia norte.

las estipulaciones del convenio privado de 29 de octubre de 1919, los hermanos Ramos se convirtieron en dueños, en común pro indiviso con Lloréns, de 5/6 partes de la mitad de las 137 cuerdas, correspondiendo la otra sexta parte a Don Manuel F. Rossy según dicho convenio privado. Que establecida la comunidad el Sr. Lloréns Torres continuó en la posesión de dichos terrenos en nombre y representación de todos los componentes de la misma. Que ni Lloréns ni sus herederos habían dado cumplimiento al convenio, documento que según información y creencia estaba en posesión del Sr. Rossy fallecido el 6 de agosto de 1932, se había extraviado y no fue hasta enero 22 de 1952 que el original se encontró entre los papeles dejados por el Sr. Rossy.

(10) En una segunda causa de acción alternativa alegaron los demandantes que la intención había sido venderle al Sr. Lloréns sólo los terrenos secos y firmes de la finca, y que las 137 cuerdas de mangles se le traspasaron como fideicomisario o "*trustee*" por y para beneficio propio y de los causantes de los demandantes y con el propósito de que el Sr. Lloréns, quien era abogado y persona influyente, pudiera hacerse cargo de la defensa del derecho de propiedad sobre los manglares en el litigio con El Pueblo de Puerto Rico; y que las estipulaciones del contrato privado de 29 de octubre de 1919 eran sólo una medida para satisfacer al Sr. Lloréns Torres compensación por sus servicios, reconociéndole una mitad de dicho terreno de mangle y para compensar igualmente al Sr. Rossy sus servicios profesionales mediante la ayuda que habría de dar al Sr. Lloréns para esclarecer el derecho y título de los causantes de los demandantes en dichos terrenos. Alegaron también que el precio de venta pactado en la escritura cubría únicamente los terrenos secos o firmes de la finca rústica; que la consideración para el traspaso del terreno de mangle fue el valor de los servicios profesionales en cuanto a la mitad de dichos terrenos, "que-

dando la otra mitad siempre de la propiedad y pleno dominio de los causantes de los demandantes."

(11) En una tercera causa de acción alegaron los demandantes que había 40.827 cuerdas de manglares en poder de la sucesión demandada y que correspondiéndoles a ellos y a Rossy la mitad de 137 cuerdas (68.50), Lloréns había dispuesto de la diferencia, 27.673 cuerdas pertenecientes a los demandantes, el valor en efectivo de las cuales reclamaron éstos en la cantidad de $138,365.

(12) En una cuarta causa de acción los demandantes alegaron que los terrenos de mangles que reclamaban estaban unidos a porciones de terreno seco de los demandados y solicitaron un deslinde judicial para determinar la extensión exacta así como la localización de dichos manglares reclamados.

(13) El 29 de septiembre de 1952 compareció en el pleito Don Manuel H. Rossy como único heredero y causahabiente de Don Manuel F. Rossy e interpuso demanda de intervención contra la Sucesión Lloréns reclamándole la sexta parte de la mitad de las 137 cuerdas. La demanda de intervención contiene las mismas alegaciones hechas por los demandantes sucesores de los hermanos Ramos Buist.

(14) Contra la demanda y la demanda de intervención de Rossy los demandados interpusieron defensa de prescripción. Se desestimó dicha defensa en cuanto a la demanda original. En ocasión posterior otro Magistrado la declaró con lugar en cuanto a la primera, tercera y cuarta causas de acción de la demanda del interventor Rossy. También eliminó dicho Magistrado las alegaciones básicas de la segunda causa de acción alternativa. Este Tribunal revisó dicho fallo en *certiorari—Rossy* v. *Tribunal*, 80 D.P.R. 729—y declaró prescrita también la segunda causa de acción. Así dejamos prescritas todas las cuatro causas de acción del interventor. El fundamento de este Tribunal fue que se trataba de acciones personales que prescribían a los 15 años, en este caso, a partir del 18 de febrero de 1931 fecha en que tanto los

demandantes Ramos como Rossy pudieron haber reclamado su derecho bajo el convenio privado de 29 de octubre de 1919. Por otra parte este Tribunal no sostuvo la eliminación decretada de las alegaciones de la segunda causa de acción alternativa, pero hizo un pronunciamiento de que aquellas alegaciones· eliminadas en el sentido de que "la causa o consideración de la trasmisión por dicha escritura de los terrenos de mangles a Lloréns fue el valor de sus servicios profesionales como abogado en cuanto a una mitad de dichos manglares, *quedando la otra mitad siempre de la propiedad y pleno dominio de los hermanos Ramos Buist*," Correspondía alegarlas únicamente a dichos hermanos Ramos quienes eran los dueños de la finca antes de celebrarse el contrato de compraventa, y no a Rossy. 80 D.P.R., pág. 753.

(15) En noviembre 8, 1957, los demandantes ·Ramos radicaron una demanda enmendada y suplementaria sustancialmente con las mismas alegaciones y razón de pedir, adicionaron una causa de acción contra Don Felipe Segarra para anular transacciones de éste y los sucesores de Lloréns realizadas con posterioridad a la demanda original que alegaron fueron hechos en combinación y concierto para perjudicar sus derechos, y aumentaron el valor en efectivo de los mangles reclamados y vendidos de $138,365 a $553,460.

(16) Recibido el Mandato en el Tribunal Superior de la decisión de *Rossy* en octubre 7, 1958, los demandantes y el interventor enmendaron de inmediato sus demandas para alegar actos interruptores de· la prescripción extintiva.([3])

---

([3]) Nuestra decisión en el *certiorari* de *Rossy* dispuso por completo de la acción de éste declarándola totalmente prescrita, e indirectamente dejó en pie la de los hermanos Ramos sólo en cuanto a la alegación mencionada en la segunda causa de acción alternativa de tipo reivindicatoria al efecto de que ellos eran dueños de la mitad de los manglares reclamados al hacerse el convenio. Debido a dichas enmiendas sobre la interrupción de la prescripción, se explica que tanto la acción de los Ramos como la de Rossy pudieran litigarse en los méritos en todas sus causas de acción, no obstante el fallo de este Tribunal en esa etapa de los procedimientos.

(17) Los demandados negaron todos los hechos básicos y esenciales de las demandas, reprodujeron sus defensas de prescripción extintiva y alegaron prescripción adquisitiva a su favor, tanto la ordinaria como la extraordinaria. El pleito fue a juicio bajo una estipulación de las partes en que no se litigaría la causa de acción relativa al deslinde judicial ni tampoco se litigarían aquellas alegaciones referentes al número de cuerdas de manglares reclamadas que los demandantes y el interventor alegaban habían sido vendidas y su valor en dinero, ni a las que quedaban en poder de los demandados.

Visto el caso, la cuestión litigiosa en sí quedó sometida sólo a base de prueba documental, ya que la prueba oral de los demandantes y del interventor se circunscribió a los actos encaminados a interrumpir la prescripción, y a explicar cómo fue hallado el original del convenio de 29 de octubre de 1919. A base de la prueba la Sala sentenciadora en sus conclusiones desestimó la teoría de la constitución de un fideicomiso en relación con los manglares reclamados, y rechazó la alegación de que los demandantes sólo habían vendido a Lloréns los terrenos secos de la finca y no los manglares. Dijo "No merece seria consideración la alegación de los demandantes, que hace suya el primer interventor, al efecto de que la venta de la finca Monte Rey por los hermanos Ramos Buist a Lloréns Torres efectuada por la escritura número 42 de 29 de octubre de 1919 ante el Notario Luis Abella Blanco comprendió únicamente los terrenos secos de la misma o sea que la venta no incluyó los terrenos manglares en controversia, en cuyo caso la acción ejercitada sería una de reivindicación que no estaría prescrita por el transcurso de quince años. Nada hay en la escritura de compraventa ni en la conducta de las partes que autorice tal conclusión. La escritura es clara y explícita al efecto de que por la misma se vende la finca Monte Rey *de doscientas veinte cuerdas más o menos, de terreno de vega, poyales y manglares.*'" (El

énfasis es del original.) Más adelante expresó: "La alegación de la Segunda Causa de Acción, alternativa, de la demanda del caso y de la demanda del primer interventor de que los terrenos manglares de la finca Monte Rey fueron trasmitidos a Lloréns Torres como fideicomisario o trustee para beneficio propio y de las mismas partes del convenio de 29 de octubre de 1919 debe rechazarse . . . . Nada hay en la escritura número 42 de 29 de octubre de 1919 que pueda interpretarse como que establece o constituye tal supuesto fideicomiso. Y claro está, el documento privado de la misma fecha, aparte de que nada dice sobre la creación de un fideicomiso, no sería el documento adecuado para ello." Las anteriores conclusiones, que disponen de la segunda causa de acción alternativa de naturaleza reivindicatoria están plenamente sostenidas por el récord, y se aceptan por ser correctas. (⁴) Queda así resuelto el primer fundamento de impugnación de la sentencia levantado en este recurso.

En lo que respecta a la primera causa de acción, la Sala sentenciadora concluyó que a partir del 18 de febrero de 1931

---

(⁴) En la escritura de partición entre los hermanos Ramos y Rubert, un mes antes de formalizarse la escritura de venta a Lloréns, se describen las 680 cuerdas de Rubert como terrenos de vega, sobrevega, montes, poyales y manglares, y las 220 cuerdas Monte Rey como vega, poyales y manglares, y surge de dicho documento y se constata en los planos, que los manglares no formaban un solo cuerpo unitario separado, sino que había manglares junto con terrenos firmes esparcidos a través de la finca San Patricio. El terreno de ambas porciones era similar. A la parte de Rubert se le fijó un valor a razón de $44.11½ la cuerda y al predio Monte Rey un valor de $9,800 por el cual ya se había concertado su traspaso a Lloréns. El precio por cuerda fijado a Lloréns resultaba de $44.54½ y habiendo adquirido por $10,000 en redondo, las pagó a $45.45, algo más que el valor fijado a las de Rubert y que se explica por el hecho de que las 220 cuerdas eran llanas, de vega, y las de Rubert tenían sobrevega y montes. Este hecho confirma que Lloréns pagó por todas las 220 cuerdas que adquirió en una transacción genuina y al precio corriente y ordinario, no a un precio artificial o ficticio rebajado con miras a otras reservas o intenciones de las partes. En el momento de su adquisición Lloréns constituyó hipoteca a favor de un tercero sobre la totalidad de la finca Monte Rey por $7,000 parte del precio de compra de $10,000 que pagó en presencia del notario. Durante toda su vida Lloréns realizó actos de riguroso dominio sobre la totalidad de la finca Monte Rey, y no de sólo parte de la misma.

el Sr. Lloréns venía obligado a traspasar a los hermanos Ramos Buist y a Rossy la mitad de 123 cuerdas, en virtud del convenio privado. Sustanció su conclusión de la siguiente manera: "El resultado efectivo de la reclamación del Pueblo de Puerto Rico, así transigida, fue que El Pueblo de Puerto Rico recuperó 177 cuerdas de terrenos manglares del total de 300 cuerdas reclamado en su demanda y Lloréns Torres retuvo 123 cuerdas de terreno manglares que unidas a las 97 cuerdas de terreno seco según la estipulación de 5 de agosto de 1924 hacen las 220 cuerdas inscritas de la Hacienda Monte Rey compradas a los hermanos Ramos Buist."

Hemos hecho un detenido estudio de toda la prueba documental incluyendo las constancias de los expedientes judiciales y los planos, y a la luz de esa prueba que contiene hechos que precedieron las transacciones del 29 de octubre que no aparecen en éstas, y hechos coetáneos e inmediatamente posteriores, llegamos a la conclusión que de la apreciación y peso de la prueba considerada en conjunto y a la luz de todas las circunstancias presentes, no surge, con aquel grado de persuasión legalmente requerido para dejar probado un hecho, que en consecuencia de la reclamación del Pueblo Lloréns viniera obligado a traspasar a los demandantes la mitad de 123 cuerdas u otra cantidad de terreno, bajo lo pactado en el referido convenio privado. Vamos a explicar nuestra conclusión basada en prueba que, por ser sólo documental, podemos apreciarla al igual que en primera instancia.

El Pueblo de Puerto Rico era dueño por cesión de la corona de España y luego del Congreso de los Estados Unidos de un manglar de 1,003.61 cuerdas situado al fondo de la Bahía de San Juan en la jurisdicción de Cataño, Guaynabo y Río Piedras, en lindes al norte con la bahía. Por Proclama del Gobernador Yaeger de 28 de mayo de 1918, Boletín Administrativo Núm. 143, dicho manglar fue declarado un bosque

insular a tenor de la Ley Núm. 22 de 22 de noviembre de 1917 que estableció el Servicio Forestal, se puso bajo el cuidado y conservación inmediatos del entonces Comisionado de Agricultura y Trabajo y se prohibió el corte de árboles y leña para carbón o cualquier otro fin.

Conjuntamente con la interposición de la demanda en abril 16 de 1920, El Pueblo de Puerto Rico radicó una petición de *injunction* contra Lloréns y alegó que el predio objeto del pleito, de aproximadamente 300 cuerdas o más *accesibles a las altas mareas*, formaba parte integrante del manglar de 1,003.61 cuerdas; que dicho predio había sido puesto bajo la supervisión, cuidado y régimen del Negociado de Servicio Forestal el cual estaba cuidando del mismo y le prestaba toda la atención requerida por ley y para su fines hasta que en uno de los días del *mes de enero de 1920* Lloréns tomó posesión del predio señalado despojando al Pueblo de la suya, y empezó a cortar mangles, a fabricar carbón, a abrir zanjas y a realizar otros trabajos destructivos del arbolado, y de roturación y cultivo. El *injunction* se decretó el mismo día, ordenando a Lloréns que se abstuviera de continuar realizando dichos actos hasta tanto se decidiera el pleito en definitiva.

La posición de Lloréns fue que la finca San Patricio tenía 1,077 cuerdas en lugar de 900; que Monte Rey, su finca, tenía dichas 177 cuerdas adicionales o sea 397 cuerdas según plano que acompañó a la contestación del pleito y en que el ingeniero Sr. Nin dice que midió "siguiendo los linderos indicados por el Sr. Lloréns." Juró en la contestación que 150 cuerdas eran terrenos firmes y buenos en el sur y este, 120 terrenos poyalosos con algunos mangles en parte de la parte norte accesibles a las extravasaciones del río desde que se constituyó el acueducto de San Juan, y las restantes 130 cuerdas en la parte oeste eran de "marisma," cenagosas, y "accesibles a las extravasaciones y filtraciones marítimas

en las mareas extraordinarias" que remontaban por el Río Puerto Nuevo y otros caños de la bahía. (⁵)

No hay duda que el pleito surgió debido a los actos de Lloréns ya descritos, realizados en una propiedad que estaba bajo la atención y supervisión inmediatas del Servicio Forestal. De hecho, la controversia giró sobre el deslinde, en la colindancia oeste, del predio reclamado y la propiedad de Lloréns a base del deslinde la zona marítima y el título sobre la porción de "marismas" o terrenos inundables con las filtraciones y aguas extravasadas del mar con el flujo de la marea. La Corte de Distrito al establecer de hecho que el predio reclamado era parte del manglar de 1,003.61 cuerdas y al determinar en ley que la línea divisoria entre ambas propiedades era aquella más alta que marcaran las aguas en el flujo y reflujo de la marea, citando el Art. 339 del Código Civil español y *Pueblo* v. *Dimas*, 18 D.P.R. 1061, resolvió que el título de Lloréns "no abarca" la porción de terreno en litigio .y declaró con lugar la demanda. (⁶)

---

(⁵) Suman 400 en lugar de 397. Puede observarse que la descripción del terreno de 270 cuerdas se asemeja mucho a la descripción del terreno de las 220 cuerdas, lo cual indica que las 130 cuerdas de "marisma" o terreno cenagoso sujeto a las filtraciones de las mareas, cosa que no se menciona al describirse la finca de 220 cuerdas, eran parte de las 177 adicionales reclamadas por Lloréns; que esta área adicional se proyectaba en dirección al oeste, hacia la bahía y hacia el manglar de 1,003.61 cuerdas y que unas 47 cuerdas de las 177 podían corresponder a las 270.

(⁶) La demanda no describe el predio de aproximadamente 300 cuerdas por sus puntos, rumbos y ángulos. Tampoco estaban inscritas las 1,003.61 cuerdas. En su sentencia la Corte no fijó físicamente en el terreno el lugar más alto que marcaban las aguas. Partiendo del supuesto que Lloréns sólo había adquirido 80 cuerdas a base de la cabida original inscrita de San Patricio (ni 220 ni 397), le pareció "más lógico *atribuir* ese aumento" de 317 cuerdas a la apropiación ilegal de las 300 cuerdas reclamadas. Según observamos en ocasión anterior, la Corte no tomó en consideración la cabida inscrita de San Patricio de 900 cuerdas, sino 760, ni la de Monte Rey de 220, sino 80, cabidas mayores que según expresaron las .partes en la escritura de Partición de 27 de .septiembre de 1919 respondían a una mensura hecha "por Agrimensores geómetras competentes con aparatos adecuados." Si la Corte hubiera considerado la cabida inscrita de 220 cuerdas, la apropiación ilegal que *atribuyó* a Lloréns hubiera sido de 177 en lugar de 300, lo cual coincide con la cabida adicional no inscrita que Lloréns le atribuía a su propiedad.

La sentencia final reconoció a Lloréns como tercero las 220 cuerdas adquiridas por él bajo la protección del Registro. Ello más bien indica, a la luz de los hechos y circunstancias expuestos, que Lloréns no tuvo éxito en hacer valer su tesis de las 177 cuerdas adicionales, con mucha más certeza y lógica que el que Lloréns hubiera derrotado una reclamación del Pueblo dentro del área de dichas 220 cuerdas. Lo otro en esta sentencia fue una fijación del linde oeste de las 220 cuerdas con los terrenos del Pueblo, quedando iguales las otras colindancias. Medidas éstas según se estipuló comenzando desde la quebrada Verraco en el fondo de la finca y divisoria del resto de Rubert por el este y sureste, en dirección hacia el oeste hasta una línea de norte a sur paralela a la carretera insular, el récord no permite determinar si esta línea de deslinde a ser trazada por ingenieros del Departamento del Interior, cuando se trazó, traspasaba o no la línea más alta que marcaban las aguas en el flujo y reflujo de las mareas, y por ende, no puede determinarse por el récord si al fijarse la divisoria Lloréns obtuvo para su beneficio, como parte de las 220 cuerdas efectivas, alguna porción del manglar reclamado.

No obstante las aseveraciones de los hermanos Ramos sobre la corrección y certeza de la cabida de 220 cuerdas hechas un mes antes en la escritura de Partición, con toda probabilidad, y así lo entendió la Sala sentenciadora, ellos y Lloréns estaban pensando en la discutible área adicional de 117 cuerdas al otorgarse la escritura de venta y el documento de octubre 29 de 1919 y quizás la contemplaban ya en julio cuando consideraban una transacción. Desgraciadamente, este pleito se inicia después de 32 años de esas transacciones, cuando ya habían fallecido los pactantes directos y no pudieron declarar y cuando, por razón de múltiples transacciones y desmembraciones de la finca y rellenos y obras realizadas por terceras personas adquirentes, la identificación física de cualquier porción de terreno objeto de este litigio con el que tuvieron en mente las partes, ya fuera para su

recuperación en fundo o para obtener su valor en sustitución, resulta difícil de establecer.[7] La identificación física de tal terreno con la propiedad en sus actuales características no se alegó ni se litigó ante la Sala sentenciadora y, como expusimos antes, en la finca San Patricio había manglares esparcidos junto con terreno firme.

Para más incertidumbre, ni el documento de 27 de julio de 1919 ni el posterior de 29 de octubre, ni en la escritura de Partición de 27 de septiembre, los tres documentos que hacen referencia al aludido terreno de manglares, se expresó la extensión o cabida del mismo, ni se localizó por sus puntos y rumbos. En el de 27 de julio se expresa que "los Sres. Lloréns y Rossy gestionarían en la Administración Insular la obtención de los manglares que están hacia la parte nordeste de la finca *en el límite del mar*, y la cantidad de tierra *que se obtenga por eso* se dividirá entre el comprador y los vendedores." No sabemos si se estaba pensando, pero es probable por los términos usados que enfatizamos, en las 177 cuerdas adicionales que Lloréns sostenía eran de Monte Rey. Es probable también que entre julio 27 y octubre 29 Lloréns *gestionara* ante la Administración Insular, sin éxito, por lo que en el de 29 de octubre se habla de un "pedazo" de manglares, en la parte norte de la finca, "que *pretende* sin razón reclamarle [a Lloréns] el Pueblo de Puerto Rico." Desafortunadamente, decimos de nuevo, no estaban vivas las partes contratantes para que nos ofrecieran su intención. Más adelante se expresa en este documento que el terreno está en un perímetro que se describe con lindes tan amplios en el plano que el "pedazo" equivaldría a la mayor parte de la

---

[7] La propia prueba de los demandantes señala que antes del año 1931, fecha de la sentencia, los Ramos tenían en su poder, y la tenía ya en el 1931 el Dr. Rafael Ramos Mimoso quien realizó la gestión principal de reclamarle a Lloréns, una copia literal del documento privado de 29 de octubre, con su autenticación notarial inclusive y el número del *afidávit*, copia ésta que admitía fácil identificación con el original aparentemente extraviado y encontrado en 1952.

finca. En la escritura de Partición no se menciona siquiera un lugar.

Ante todos los hechos expuestos, una estipulación de las partes en el pleito del Pueblo hecha con miras al plano preparado por Lloréns según los linderos por él indicados, al efecto de que de las 397 cuerdas el Pueblo reclamaba sólo las 300 *cenagosas* descritas en la demanda, quedando fuera del pleito las 97 restantes situadas en la parte seca o sur, colindando por el norte y el oeste con dichos terrenos cenagosos reclamados—estipulación ésta que no sirvió de base para la sentencia dictada—por sí sola no prueba, distinto a los demás hechos, que Lloréns obtuvo del Pueblo de Puerto Rico 123 cuerdas y que las mismas eran aquéllas señaladas por los contratantes con la obligación de dividírselas. Si el pleito se hubiera litigado contra una cabida de 220 cuerdas, habría más indicio de que Lloréns hubiera logrado obtener del Pueblo algún terreno al conservar su cabida inscrita. Litigado a base de 397 cuerdas, más bien quedó demostrado en su lugar que él no pudo hacer valer la cabida adicional de 177 cuerdas según las describió bajo juramento en su contestación.

Finalmente, si bien Lloréns compró a precio alzado, cosa común, por las constancias del récord y por su conducta después de la adquisición, no creemos que pagara por 220 cuerdas al precio normal a sabiendas de que sólo obtenía 80, una diferencia de casi dos terceras partes, más la obligación de litigar por el resto de lo adquirido y dividir el producto de salir victorioso. Parece ser más razonable que ante la posibilidad o expectación de que Monte Rey tuviera 397 cuerdas en lugar de 220, estuviera en mente de las partes la distribución de cualquier exceso sobre 220 que Lloréns lograra obtener contra el Pueblo, considerando además que el límite del manglar público en relación con la finca presentaría una cuestión discutible de interpretación legal a la luz de las Leyes de Aguas y de Puertos.

La Sala sentenciadora, no obstante su conclusión en cuanto a la obligación de Lloréns, halló prescritas las acciones y dictó sentencia declarando sin lugar las demandas. El carácter personal de estas causas de acción, prescriptibles a los 15 años, se determinó ya por este Tribunal, en el *certiorari, Rossy* v. *Tribunal,* antes citado. En vista de nuestras conclusiones, es innecesario discutir si hubo o no error en la eliminación de la prueba oral que tendió a establecer actos interruptores de la prescripción.

*Se confirmará la sentencia en cuanto a los demandantes Sucesores de los Hermanos Ramos Buist. La sentencia en cuanto al demandante Rossy adquirió firmeza al no ser recurrida ante nos. Esta opinión dispone igualmente del recurso 289 interpuesto por los demandados Sucesores de Lloréns.*