Jacob Ortiz, conocido por Jacob Cruz Ortiz, demandante y recurrido, *v.* Enrique Cruz Pabón et al., demandados y recurrentes.

*Número:* R-73-322     *Resuelto:* 30 de mayo de 1975

*Carlos García Méndez* y *A. Ramírez Silva,* abogados de los recurrentes; *Enrique Báez García* y *Víctor E. Báez,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR IRIZARRY YUNQUÉ emitió la opinión del Tribunal.

Por segunda vez está ante nos el drama de la vida real que motivó nuestra decisión de *Ortiz* v. *Cruz Pabón,* 99 D.P.R. 237 (1970). Sus inicios se remontan al año 1925, en un apartado rincón del barrio Guamá de San Germán, siendo protagonistas un rico hacendado, que entonces frisaba sus 43 años de edad, y una muchacha de 17 años, hija de su mayordomo. Estamos ante el epílogo de la acción instada por quien reclama ser el fruto de las relaciones amorosas entre aquel hombre y aquella mujer campesina.

La controversia ante nos gira sobre el valor probatorio de la declaración de un abogado como testimonio de impugnación, y el valor que debemos conceder a unas fotografías que nos son presentadas como prueba de parecido fisonómico entre el demandante y el hombre que varios años después de su nacimiento se casó con su madre. La única prueba testifical pertinente a las alegaciones de las partes fue presentada por el demandante. Fue abundante, robusta y convincente, como para superar las exigencias de antes de *Figueroa* v. *Díaz,* 75 D.P.R. 163 (1953). El tribunal de instancia le dio entero crédito, y con base en ella formuló las siguientes determinaciones sobre los hechos:

## DETERMINACIONES DE HECHOS

1. Don Gregorio Ortiz era mayordomo de don Jaime Acosta Forés en una finca de éste último dedicada a la siembra de caña de azúcar y vaquería radicada en el Barrio Guamá de San Germán.

2. Don Gregorio casó en primeras nupcias y de ese matrimonio nació su hija llamada Virginia Ortiz Sáez conocida también por Virginia Ortiz Ocasio. De muy tierna edad doña Virginia, murió su señora madre y ella quedó al cuidado de su padre y de la segunda esposa de éste. Doña Virginia nació en el 1907. Allá para el 1926, fecha en que ocurrieron los hechos que motivan este pleito, doña Virginia tenía alrededor de 18 años de edad. Para esa misma fecha don Jaime Acosta era un hombre casado con la codemandada doña Delia Luisa López, con quien vivía. Tenía don Jaime entonces alrededor de 43 años de edad.

3. Don Jaime Acosta Forés requirió de amores a Virginia, la hija de su mayordomo. Resistió ella las promesas amorosas por algún tiempo. Luego lo aceptó y establecieron noviazgo por poco tiempo. Una noche entre fines del año 1925 y mediados del 1926 doña [sic] Jaime Acosta Forés llevó a Virginia a un Hotel en Mayagüez, se instaló con ella en una habitación de dicho hotel donde pasaron la noche. Allí tuvieron relaciones sexuales. Antes de esa fecha Virginia no había tenido novio ni amante. Fue virgen hasta esa noche. Al día siguiente por la mañana don Jaime llevó a Virginia desde el Hotel en Mayagüez hasta su propio hogar en San Germán. Ese día la esposa de don Jaime estaba en la Parguera. Allí permanecieron hasta el día siguiente cuando don Jaime la llevó al hogar de su padre (el de Virginia) quien era su mayordomo y vivía en la finca y en una casa de don Jaime en el Barrio Guamá. Siguieron cohabitando entre sí en la misma casa de la finca. A los pocos meses Virginia salió encinta y don Jaime Acosta le construyó una habitación adicional a la casa donde siguió cohabitando con Virginia. Durante el embarazo ella enfermó y la fue a visitar el Dr. Edgardo Quiñones pagando don Jaime los gastos y honorarios del médico.

4. Durante el embarazo las relaciones fueron públicas. Así lo declaró ella y su hermano, Guillermo. Además los testigos Carmelo Velázquez Padilla de 71 años, residente en el Barrio Guamá y Nicolás Velázquez Padilla, quienes también eran peones de don Jaime Acosta, declararon que vieron a Virginia, 'con barriga', en ocasión en que estaba sentada con don Jaime en una

hamaca en el centro de la casa, se acariciaban, sentada ella en la falda de don Jaime 'acaramelaos y besándose'.

5. El demandante, fruto de esas relaciones, nació el 20 de junio de 1927 y cuando Virginia fue a inscribir a su hijo en unión de su hermano, Guillermo, preguntó a don Jaime Acosta Forés con qué nombre debía inscribirlo. El instruyó que se le inscribiera con el nombre de Jacob porque según le dijo don Jaime, dijo Doña Virginia, Jacob es el nombre de Jaime en inglés. Nos llama la atención el hecho de que doña Virginia Ortiz, quien apenas sabe leer el español pudiera anticipar la tramitación de este pleito cuando en el año 1927 puso a su hijo, el hoy demandante, el nombre de Jacob que en inglés equivale, entre otros, al de Jaime en español. Concluimos, al darle crédito a la declaración de don Guillermo y de doña Virginia, que don Jaime escribió el nombre de Jacob en un papel y lo entregó a éstos para que con ese nombre inscribieran al niño.

6. Luego de nacido, el niño, don Jaime Acosta siguió viviendo con doña Virginia en la misma casa del mayordomo de don Jaime, que a la vez era el padre de doña Virginia. Le proporcionaba todos los gastos y dio instrucciones para que de la vaquería que había en la finca le enviaran dos litros de leche diarios a Virginia. De esos menesteres se encargaba el testigo Carmelo Velázquez Padilla, según su testimonio, el que creemos.

7. Allá para el 1929 don Jaime se enamoró de otra mujer y perdió el interés en Virginia. Sin embargo continuó supliéndole las necesidades de Virginia y de su hijo.

8. El codemandado, don Enrique Cruz Pabón era casado con Confesora Santana. Se divorció de ella en el 1929. No hubo hijos en ese matrimonio. A mediados de 1930 don Enrique Cruz Pabón, libre de su matrimonio con doña Confesora Santana y doña Virginia Ortiz, libre de sus relaciones con don Jaime Acosta, empezaron a llevar amores y contrajeron matrimonio en diciembre de ese año. En el acta de ese matrimonio no se hizo constar que tuvieran hijos que legitimar. Del acta de matrimonio surge que don Enrique y doña Virginia fueron casados por el Vicario de San Germán. Don Enrique ganaba de $4.00 a $5.00 en la semana en labores agrícolas, era completamente pobre y además divorciado. Doña Virginia era mujer que había tenido dos hijos antes de ese matrimonio. A pesar de esas circunstancias el matrimonio fue celebrado en el Barrio Guamá de San Germán, lugar apar-

tado de la ciudad, por el rito católico y los gastos del matrimonio fueron pagados por don Jaime Acosta Forés.

9. Don Enrique y doña Virginia fueron a vivir como marido y mujer a una casa cercana a la ocupada por don Gregorio Ortiz, el mayordomo de don Jaime. Jacob, el demandante, quedó viviendo en unión de su abuelo don Gregorio en la casa de la finca de don Jaime por orden de éste. Don Jaime continuó suministrándole todos sus gastos a Jacob hasta que Jacob se graduó de escuela superior.

10. Al entrar a la escuela superior Jacob pidió a su padre que le diera el apellido porque, el no tenerlo, le creaba una situación incómoda en relación con los otros estudiantes. Don Jaime Acosta le contestó a Jacob que no se preocupara porque lo del apellido él lo arreglaría. Don Jaime habló con don Enrique Cruz Pabón y le pidió a éste, que todavía era su peón, que ya que se había casado con la madre de Jacob reconociera a éste como su hijo, como procreado por él con ella para que así Jacob tuviera apellido al graduarse de escuela superior. En el acta de matrimonio de don Enrique con doña Virginia no se hizo constar que hubiera hijos procreados por ellos. Si en realidad hubieran procreado hijos entre sí antes de casarse la legitimación hubiera sido automática. A nuestro juicio eso explica porqué don Enrique tuvo que jurar que Jacob era su hijo procreado con doña Virginia, para poderlo legitimar.

11. Don Jaime Acosta autorizó a don Enrique Cruz Pabón a buscar un abogado que preparara la documentación de legitimación. Don Enrique contrató los servicios de un abogado y éste siguiendo las instrucciones de don Enrique procedió a juramentar una declaración en que don Enrique Cruz Pabón legitimaba a Jacob alegando falsamente que era hijo suyo. En ese procedimiento de legitimación no intervinieron Jacob ni doña Virginia.

12. Al graduarse Jacob de escuela superior volvió a ver a don Jaime Acosta y éste le aconsejó que se fuera a Nueva York y que él le pagaría los gastos de transportación. Así lo hizo Jacob y el dinero de la transportación a Nueva York fue pagada por don Jaime. Desde Nueva York Jacob escribió a don Jaime en dos (2) ocasiones pero no recibió contestación a sus cartas.

13. En el 1955 don Gregorio, abuelo de Jacob, falleció. En esa ocasión Jacob vino a la isla, vio a don Jaime, le pidió ayuda y

éste le dijo que nada podía hacer. Entonces Jacob, acudió a la oficina del Licenciado Enrique Báez García para litigar su derecho y dicho abogado le contestó a Jacob que a su juicio no tenía derecho alguno que reclamar.

14. A la muerte de don Jaime Acosta ocurrida en el 1964 Jacob solicitó de nuevo los servicios de dicho abogado, Enrique Báez García, y éste le informó que por haber cambiado la doctrina jurisprudencial en Puerto Rico, entonces sí tenía derecho. Así, se procedió a radicar la demanda en el presente pleito, en 16 de julio de 1965." (¹)

Como señaláramos, la prueba que tuvo ante sí el tribunal de instancia apoya plenamente sus determinaciones. Hemos leído y releído su transcripción. Se trata de testimonios de personas humildes, la mayor parte de ellas vecinos que fueron del barrio Guamá para la época en que se desarrollaba el romance entre Jaime Acosta Forés y Virginia Ortiz, y algunas de ellas ancianos, ya en las postrimerías de sus vidas. Raras veces es posible trascender el inexpresivo relato que leemos en la transcripción de unas notas taquigráficas para captar la espontaneidad y la candidez de los testimonios vertidos. Este caso nos presenta una de esas raras ocasiones. Los acuciosos y hábiles contrainterrogatorios de los abogados de la parte demandada aquí recurrente, lejos de hacer mella en la credibilidad de esos testimonios, permitieron que afloraran detalles que los robustecieron aún más. Baste, para ejemplo, mencionar al testigo Nicolás Velázquez Padilla, nacido en 1893 y quien para la fecha de la celebración del juicio hacía diez u once años que estaba desvinculado del barrio Guamá. La actitud permisiva y dócil del mayordomo de Acosta Forés ante los requiebros amorosos de éste a su hija Virginia, y su pasividad ante la ampliación de la casita para añadirle una habita-

---

(¹) *Ocasio* v. *Díaz*, 88 D.P.R. 676, resuelto en junio de 1963, reconoció el derecho de la persona nacida fuera de matrimonio a establecer su filiación biológica a todos los fines, incluyendo sus derechos hereditarios, a determinarse de acuerdo con la ley vigente en la fecha del fallecimiento del causante.

ción para compartirla los amantes, queda explicada con las siguientes sencillas palabras del testigo, dichas espontáneamente en contestación a la pregunta de si Virginia era bonita:

"Bonita, hermosa, tenía como 17 ó 18 años. Como él tenía chavos y ella era hija de su mayordomo, como el mayordomo hacía lo que él hacía. A veces lo abochornaba y él se iba."

Con esas palabras queda palpable un hecho muy característico del sistema feudal de hace medio siglo, y de que por desgracia aún quedan retazos. El infeliz campesino, que en los más de los casos ni siquiera sabía escribir su nombre, era tan propiedad del dueño de la tierra como la tierra misma, y su sentido de servitud le impedía rehusar al amo hasta la indignidad de que poseyera a sus hijas. No era de extrañar que en aquella sociedad de infelices que eran peones de generación en generación, sintieran éstos hasta orgullo de que el señor de la tierra "se fijase" en sus hijas, más aún quien lograba salir de la condición de peón para ocupar la de mayordomo.

Al ser contrainterrogado, el testigo Velázquez Padilla aportó con precisión datos que corroboraron en forma impresionante lo declarado por otros testigos. En su caso, dadas sus circunstancias personales y la forma como se elucidó su testimonio respondiendo a la hábil e incisiva repregunta de uno de los abogados de la parte recurrente, pensar que sus palabras fueran producto de fabricación sería una conjetura injustificada.

Los errores que la parte recurrente señala van todos dirigidos a impugnar la apreciación de la prueba. Al hacerlo, pone gran énfasis en el hecho de que Enrique Cruz, en documento jurado ante notario, reconoció a Jacob Ortiz como hijo suyo, y que el testimonio del notario, traído para impugnar a Enrique Cruz debió merecer más crédito al tribunal que el de éste.

La falsedad de lo consignado en el referido documento fue precisamente lo que el demandante Jacob Ortiz atacó. Y tanto

su propio testimonio, como el de su señora madre, el de todos los testigos de las relaciones entre su madre y Acosta Forés antes, durante y después del embarazo que culminó en su nacimiento, y el testimonio del propio firmante de esa declaración fueron dirigidos a establecer su falsedad. El testimonio del abogado que como notario autorizó el documento tendió a impugnar parte del testimonio de Enrique Cruz y nada más.

El tribunal no hizo pronunciamiento sobre si creyó más a Enrique Cruz que al abogado. No tenía que hacerlo. De hecho, pudo creer al abogado, que se limitó a decir que Acosta Forés no habló con él sobre la legitimación de Jacob, ni le pagó, y que Enrique Cruz no le dijo que Jacob fuera hijo de Acosta Forés, y con ello no se desvirtúa lo declarado por Cruz de que habló con el abogado por encomienda de Acosta Forés, y que los $50.00 que le pagó al abogado se los dio Acosta Forés. El testimonio ofrecido para impugnar no tiene más alcance, de ser creído, que producir una brecha en la credibilidad del testigo impugnado. No es prueba de los hechos en controversia ni puede tomarse como tal. Véase *Cintrón* v. *A. Roig, Sucrs.*, 74 D.P.R. 1028, 1034 (1953). Además, un abogado, por ser abogado, no tiene que merecerle a un tribunal más crédito que el que pueda merecerle cualquier ciudadano. La presunción de que todo testigo dice la verdad, 32 L.P.R.A. sec. 1664, no establece distinciones y cobija por igual a todas las personas.

Es innecesario que hagamos aquí una relación de los numerosos casos en que hemos resuelto que, salvo en circunstancias extraordinarias, no alteraremos las conclusiones que sobre los hechos hiciera el tribunal sentenciador. Lo hemos hecho cuando el error en la apreciación de la prueba es manifiesto, o cuando hay base en los autos para concluir que el tribunal actuó movido por pasión, prejuicio o parcialidad. *C. Brewer P.R., Inc.* v. *Rodríguez,* 100 D.P.R. 826 (1972); *Ortiz Rodríguez* v. *A.F.F.*, 94 D.P.R. 546 (1967); *Sanabria* v. *Sucn. González*, 82 D.P.R. 885 (1961); *Morales* v. *Tribunal*

*Superior*, 84 D.P.R. 123, 130 (1961). Ninguna de dichas excepciones es aquí aplicable.

"La verdad es que el testigo debe ser oído, y visto, interrogado y mirado." Así se expresa el eminente procesalista Carnelutti en su obra *Rivista di Diritto processuale civile*, año 1929. Don Alfonso de Paula Pérez, *La prueba de testigos en el proceso civil español* (ed. Reus, Madrid, 1968, pág. 7), añade: "y es que no sólo habla la voz viva. También hablan las expresiones mímicas: el color de las mejillas, los ojos, el temblor o consistencia de la voz, los movimientos, el vocabulario no habitual del testigo, son otras tantas circunstancias que deben acompañar el conjunto de una declaración testifical y sin embargo, todos estos elementos se pierden en la letra muda de las actas, por lo que se priva al Juez de otras tantas circunstancias que han de valer incluso más que el texto de la declaración misma para el juicio valorativo que ha de emitir en el momento de fallar; le faltará el instrumento más útil para la investigación de la verdad: la observación."

Réstanos considerar el valor que ante nos deben tener varias fotografías que han sido unidas a los autos. Una de ellas presenta a Jaime Acosta Forés de busto, visto ni de frente ni de perfil, el ángulo de su rostro y su mirada en una línea diagonal con la posición de la cámara. Las otras presentan a Jacob Ortiz, el demandante, de frente, y de perfil, y en las mismas posiciones a Enrique Cruz. La primera es un retrato pequeño, evidentemente tomado varios años antes del pleito. Las otras fueron tomadas luego de iniciado el pleito y por encargo de la parte demandada recurrente. Examinadas a simple vista, se diría que aparentan más parecido del demandante con Enrique Cruz que con Jaime Acosta Forés. Esa circunstancia no puede ser decisiva en este caso.

En repetidas ocasiones hemos reiterado la norma de que en relación con la apreciación de la prueba documental estamos en las mismas condiciones que el tribunal de instancia. *Planned Credit of P.R., Inc.* v. *Page*, 103 D.P.R. 245 (1975);

*Miranda* v. *Editorial El Imparcial, Inc.*, 99 D.P.R. 601–618 (1971) ; *Ortiz Rodríguez* v. *A.F.F.*, supra, pág. 550; *Ramos Buist* v. *Sucn. Lloréns Torres*, 92 D.P.R. 451 (1965) ; *E.L.A.* v. *Fonalledas Córdova*, 84 D.P.R. 573, 595 (1962). La situación ante nos plantea una excepción a ese principio.

■ Las fotografías del demandante y de Enrique Cruz son ante nosotros prueba secundaria. La primaria, y en este caso la de más valor, la tuvo ante sí el tribunal de instancia. No la hemos visto nosotros. La primaria la constituyen las personas del demandante Jacob Ortiz y del codemandado Enrique Cruz. A ellos el tribunal de instancia los vio en las numerosas ocasiones en que comparecieron a juicio, el tribunal de instancia pudo observarlos y ver sus movimientos y sus ademanes, oír sus voces, ver la expresión de sus ojos, distinguir el color de su tez.

Resolver nosotros, a base de aparentes parecidos en esas fotografías, que el tribunal de instancia erró en su apreciación de la prueba equivaldría a permitir que se probara ante nosotros, con prueba secundaria, lo que no se pudo probar con la mejor prueba—la presencia física y personal de las personas fotografiadas—ante el tribunal a quo. Ello implicaría trascender nuestra básica función revisora, y aventurarnos en la apreciación de la credibilidad de los testigos sin haberlos visto, ni observado, ni oído.

Fotografías que revelan el parecido o la falta de parecido entre personas son generalmente admisibles en acciones filiatorias, como es admisible que el Juez de instancia haga constar, a base de su propia observación, que existe o no existe parecido. Empero, como afirmamos en *Falcón* v. *Cruz*, 67 D.P.R. 530, 532 (1947), "ese hecho por sí solo no sería suficiente para que una corte pueda resolver que un niño es hijo de determinada persona 'a juzgar por su fisonomía física.' El parecido, a lo más, podrá ser un elemento a considerar en el conjunto de la prueba."

■ ·Estaríamos, respecto de las fotografías, en las mismas condiciones que el tribunal de instancia, si el tribunal de instancia no hubiese tenido ante sí y visto y observado a las personas representadas en las fotografías. 7 Jones, *On Evidence*, sec. 628. No podemos ignorar que las fotografías no son siempre una reproducción exacta y fiel de lo que pretenden representar. Muchas circunstancias pueden crear distorsiones y, en el caso de personas, lograr parecidos y desemejanzas donde no hay lo uno ni lo otro. El tipo de lente que se use para una y otra fotografía, la duración de la exposición, la distancia del lente al sujeto, la cantidad de luz y las posiciones y ángulos a que se coloquen las lámparas, y otras cosas más, incluyendo la técnica utilizada en su revelado, retocado y ampliación, son algunas de las condiciones que pueden afectar la apariencia del sujeto en una fotografía. Por todo ello, la prueba del parecido o del no parecido entre personas, especialmente cuando se trata de fotografías, no puede ser decisiva y debe ser considerada en el conjunto de todas las pruebas que tuvo ante sí el tribunal sentenciador. Véanse, sobre el particular, Ketterling, *Photography as Demonstrative Evidence in the Court Room*, 40 N.D.L.Rev. 192, 195, 1964; 1 Conrad, *Modern Trial Evidence*, sec. 752 (1956); 3 Jones, *On Evidence*, sec. 625; 3 Wigmore, *On Evidence*, sec. 792; Scott, *Photographic Evidence*, sec. 1076 (1969). El parecido entre personas es muchas veces cuestión de apreciación; algo muy subjetivo. Y no es raro hallar, particularmente entre la gente de nuestros campos, personas con rasgos fisonómicos muy semejantes, aunque no exista entre ellos parentesco alguno y, a la inversa, parientes muy cercanos—padres e hijos, hermanos, etc.—que no guardan parecido alguno entre sí. *Cf. State ex rel Rison v. Browning*, 152 Pac. 672 (Kan. 1915).

*La sentencia dictada por el Tribunal de instancia será confirmada.*

El Juez Asociado Señor Rigau disintió con opinión, con la

cual concurre el Juez Asociado Señor Díaz Cruz. El Juez Asociado Señor Martín no intervino.

—O—

Voto disidente del Juez Asociado Señor Rigau con el cual concurre el Juez Asociado Señor Díaz Cruz.

San Juan, Puerto Rico, a 30 de mayo de 1975

Disiento. He visto las fotografías y también he leído todo el caso. El parecido entre el demandante Jacobo Ortiz y Enrique Cruz es asombroso. Para parecerse tanto tendrían que ser padre e hijo, o hermanos. Debido a las edades de ellos y a las demás circunstancias del caso estoy convencido de que no son hermanos sino padre e hijo. No en balde Enrique Cruz lo reconoció legalmente como hijo suyo y se casó con Virginia la madre de Jacobo. En cambio, el demandante y Jaime Acosta Forés no se parecen en nada, aparte de ser ambos seres humanos varones.

La opinión mayoritaria acepta el parecido entre el demandante y Enrique Cruz pero minimiza ese dato. Realmente, en esencia, dice que eso no es tan importante. Tal vez eso pudiese decirse si se tratase de un caso de contratos, o de derecho laboral, o de seguros, etc., pero tratándose, como se trata, de un caso de filiación, creo que el extraordinario parecido entre Jacobo y Enrique Cruz es muy importante. No lo sabemos, pero no tendría nada de extraño, que en distintas épocas de su vida, Virginia Ortiz tuviese amores con Enrique Cruz y con Jaime Acosta Forés. Pero sin duda, la semilla que germinó fue la de Enrique Cruz y no la de Acosta.

Las ideas se trasmiten por argumentos y por escritos controvertibles; la filiación se trasmite por canales más vitales e innegables.