per curiam:
En el ejercicio de nuestra jurisdicción disciplinaria, nos corresponde la difícil tarea de separar del cargo de Juez Superior al Ledo. José A. Ruiz Rivera. Los hechos que la Comisión de Disciplina y de Separación del Servicio por Razón de Salud de Jueces y Juezas del Tribunal de Primera Instancia y del Tribunal del Circuito de Apelaciones (la Comisión) determinó probados, por unanimidad, en el proceso disciplinario instado en su contra no permiten otro resultado, dada la gravedad de la conducta imputada. Examinemos los hechos que justifican esta determinación.
I
A raíz de una carta enviada el 17 de enero de 2002 por el entonces Fiscal de Distrito Federal de Estados Unidos en Puerto Rico, Ledo. Guillermo Gil Bonar, al entonces Juez Presidente del Tribunal Supremo, Hon. José A. Andréu García, se inició una investigación administrativa contra el juez superior José A. Ruiz Rivera. La referida carta, en *249 esencia, destacaba que una investigación federal había revelado lo que podrían constituir violaciones éticas por parte de jueces del Tribunal General de Justicia de Puerto Rico. Uno de los jueces mencionados en la referida carta fue el juez superior José A. Ruiz Rivera, a quien Frankie Pietri Sepúlveda (Pietri), testigo de la investigación federal, acusó de usar en varias ocasiones la sustancia controlada conocida como cocaína.
Tras ser suspendido de sus funciones judiciales por la gravedad de la imputación, la Oficina de Administración de los Tribunales (OAT) investigó las alegaciones. Oportunamente, el 2 de octubre de 2002, formuló una querella, imputando al juez Ruiz Rivera cuatro cargos por violaciones a los Cánones de Ética Judicial de 1977, cuerpo ético que estaba vigente al momento de los hechos. Eventualmente, la OAT retiró uno de los cargos(1) y sometió la querella por los tres siguientes:

Primer Cargo

El Querellado incurrió en conducta impropia incompatible con su cargo al procurar obtener y consumir sustancia bajo la creencia e intención de que se trataba de la sustancia controlada conocida como cocaína sin estar autorizado para ello. Dicha conducta lesiona la imagen de la Rama Judicial, le incapacita para ocupar el cargo de juez e infringe los Cánones I, X, XI, XXIV y XXVI de Ética Judicial.

Segundo Cargo

El Querellado incurrió en conducta impropia incompatible con su cargo consistente en que solicitó y obtuvo del también Juez Superior, Hon. Wilfredo Santos López, una declaración de autenticidad donde el Juez Ruiz Rivera era el compareciente, sin que dicha declaración estuviera relacionada con asuntos judiciales o fuera incidental a la función judicial. Di *250 cha conducta viola las normas establecidas en la Resolución de 25 de febrero de 1982 y el Memorando Núm. 62 de 15 de mayo de 1982 que rigen las circunstancias para el otorgamiento de declaraciones de autenticidad por parte de los jueces.

Tercer Cargo

El Querellado, Hon. José A. Ruiz Rivera, incurrió en conducta impropia incompatible con su cargo al frecuentar privada y públicamente [sic] personas cuya dudosa reputación le constaba ya que conocía de la pendencia en cuanto a estas personas de casos criminales en que se alegaban infracciones a la Ley de Sustancias Controladas. Esta conducta viola lo dispuesto en los Cánones I, X, XI, XXIV, y XXVI de Ética Judicial. Informe de la Comisión de Disciplina Judicial, págs. 2-3.
La prueba desfilada ante la Comisión, y creída por ésta, reveló que el 30 de mayo y el 14 de octubre de 1996 el juez Ruiz Rivera presidió dos vistas preliminares en las que figuraron como imputados por violación a la Ley de Sustancias Controladas, Pietri y la esposa de éste. El juez Ruiz Rivera determinó causa contra Pietri, mas no así contra la esposa de éste.
Tiempo después, a finales de diciembre de 1996, mientras se encontraba en compañía de un amigo llamado Octavio González en el establecimiento “Hollywood’s Café and Pub” de Ponce, lugar que frecuentaba Ruiz Rivera, éste conoció a Pietri. Surge de la prueba que fue Octavio González quien presentó a Pietri y a Ruiz Rivera. Desde ese momento, la prueba revela que se desarrolló una relación de amistad. En esa ocasión los tres continuaron conversando y consumiendo bebidas alcohólicas en el lugar. En un momento de la noche, Pietri narró que los tres salieron al estacionamiento del local, donde consumieron cocaína.
Sobre este encuentro, el Informe de la Comisión señala, en parte:
El Querellado admitió que conoció a Pietri en el “Pub” en las fechas antes indicadas, pero de forma muy casual. Intentó pro-bar, en unión a otros testigos, que en esa ocasión estaba acom *251 pañado por su esposa. Negó haber compartido fuera del “Pub” con Pietri así como haber consumido “cocaína”. La Comisión no dio credibilidad a esta versión de lo ocurrido. De igual forma intentó impugnar sin éxito la credibilidad del testigo Pietri a través de testigos que testificaron sobre las medidas de seguridad e iluminación en el área de estacionamiento del “Pub”. (Énfasis suplido.) Informe de la Comisión de Disciplina Judicial, pág. 8.
Un segundo encuentro entre Pietri y Ruiz Rivera ocurrió en enero de 1997 en la fonda “La Bodeguita del Medio”. En ese lugar, Pietri expresó que Ruiz Rivera le dio los números telefónicos de su teléfono celular, de su residencia y de su oficina. Al respecto, el Informe de la Comisión expresa:
El Querellado admitió haber visitado la fonda “La Bodeguita del Medio”. Testificó que vio a Pietri ese día en el lugar pero alegó que tan pronto se percató de la entrada de Pietri al lugar, se marchó de forma súbita. La Comisión no dio credibilidad a gran parte de este testimonio ni a aquellos que intentaron corroborarlo. (Énfasis suplido.) Informe de la Comisión de Disciplina Judicial, pág. 9.
El tercer encuentro entre Ruiz Rivera y Pietri se acordó telefónicamente. Ambos viajaron en automóvil desde Ponce hasta San Juan en el vehículo de Ruiz Rivera, y los acompañarían, aunque en un vehículo separado, Octavio González y dos personas más identificadas como Rony y Jessy Ortiz.
Según surge del testimonio de Pietri, el grupo acudió al negocio “Coaches” en San Juan. Durante el trayecto, el juez querellado y Pietri consumieron cocaína. No obstante, al llegar al lugar acordado, Ruiz Rivera indicó sentirse incómodo, por lo que abandonó el lugar junto a Pietri. Este declaró, además, que durante el trayecto de regreso, Ruiz Rivera le expresó que sabía quién era “y que había sacado a su esposa absuelta pero que contra él había mucha prueba”. Añadió que tuvo “que renunciar el caso de asesi *252 nato de Tito Manuel por conflicto de intereses”, en alusión a un proceso penal tramitado contra el alegado jefe de Pietri en asuntos relacionados a la distribución de sustancias controladas en el área sur del país. Informe de la Comisión de Disciplina Judicial, pág. 10.
Un cuarto encuentro, según narrado por el testigo principal del proceso, ocurrió en la residencia del querellado en la urbanización Camino Sur de Ponce. Pietri conocía la urbanización, pues alegó haber estado anteriormente en ella jugando baloncesto con un amigo que residía en el lugar. Pietri indicó haber acudido a la urbanización a entregar cocaína al querellado. Expresó que ese día éste tenía una actividad familiar en su casa y que Ruiz Rivera lo invitó a quedarse. Pietri, sin embargo, rechazó la invitación. Ex-presó, además, que como en ocasiones anteriores, no cobró por el suministro de la sustancia.
Sobre estos dos últimos encuentros, la Comisión expresó en su Informe lo siguiente:
El Querellado negó totalmente el encuentro y posterior viaje con Pietri hacia “Coaches”. Aceptó que Pietri lo visitó un día en su hogar pero alegó que fue para pedirle un favor sobre un caso pendiente ante los tribunales. La Comisión no dio credibilidad a la prueba tendiente a demostrar la versión del Querellado sobre estos encuentros. (Énfasis suplido.) Informe de la Comisión de Disciplina Judicial, pág. 10.
En mayo de 1997 Pietri ingresó a una institución penal federal. Eventualmente, narró los hechos antes descritos a funcionarios federales, lo que originó la querella que nos ocupa.
II
Al delinear las normas que rigen los trámites apelativos, hemos destacado consecuentemente que los foros de instancia están ubicados en mejor posición que los apelativos para evaluar prueba testifical, pues distinto a éstos, pueden apreciar de primera mano la forma en que decía *253 ran los testigos en busca de indicios que revelen deshonestidad. Por ello, hemos expresado reiteradamente que no sustituiremos las determinaciones de hechos de los foros de instancia “[e]n ausencia de circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto”. Coop. Seguros Múltiples de P.R. v. Lugo, 136 D.P.R. 203, 208 (1994). Véanse, además: Pérez v. Col. Cirujanos Dentistas de P.R., 131 D.P.R. 545, 562 (1992); Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 172, 181 (1985).
La Comisión realiza la importante función de aquilatar la prueba para formular determinaciones de hechos, conclusiones de derecho y recomendaciones en procesos disciplinarios contra integrantes de la Judicatura. Aunque no tiene facultad para imponer sanciones, su rol en aspectos probatorios es igual al que ejercen otros foros de instancia, judiciales o administrativos.
Ahora bien, el ejercicio de estas funciones supone aquilatar la prueba a la luz de la carga probatoria aplicable a los procesos disciplinarios. Como se sabe, tal prueba consiste en prueba clara, robusta y convincente, no afectada por reglas de exclusión ni a base de conjeturas. In re Caratini Alvarado, 153 D.P.R. 575 (2001). Véase, además, Regla 25 de Disciplina Judicial, en In re Aprobación Reglas, 164 D.P.R. 137, 157 (2005).
No existe una definición precisa de dicho criterio probatorio. Sin embargo, hemos reconocido que consiste de una carga probatoria “mucho más sólida que la preponderancia de la evidencia, pero menos rigurosa que la prueba más allá de toda duda razonable”. También la hemos descrito como “como aquella [prueba] que produce en un juzgador de hechos una convicción duradera de que las contenciones tácticas son altamente probables”. In re Rodríguez Mercado, 165 D.P.R. 630, 641 (2005). Véase, *254 además, 2 McCormick on Evidence Sec. 340, pág. 425 (1999).
Con lo anterior en mente examinemos la presente querella.
Ill
La prueba de cargo descansó esencialmente en el testimonio de Pietri. Su historial delictivo, si bien debe considerarse al evaluar sus declaraciones, no es determinante per se. De igual modo, el hecho de que se trate de un único testimonio no conduce necesariamente a la conclusión de que debe descartarse. Supone ponderar otros factores que permitan determinar su confiabilidad.
La Comisión era plenamente consciente de su responsabilidad probatoria en la presente querella. Al destacar su delicada función en este ámbito, expresó en su Informe:
La Comisión escuchó la prueba testifical muy consciente de que era determinante en un caso de esta naturaleza. Las teorías fácticas de ambas partes apuntaban hacia una inevitable adjudicación sobre la credibilidad de los testigos los cuales incluían a un convicto por narcotráfico, [al] propio Querellado, [a] funcionarios de la rama judicial y [a] peritos reconocidos. Informe de la Comisión de Disciplina Judicial, pág. 6.
Inmediatamente citó nuestras expresiones en Ortiz v. Cruz Pabón, 103 D.P.R. 939, 947 (1975), en donde expresamos:
“La verdad es que el testigo debe ser oído, y visto, interrogado y mirado.” Así se expresa el eminente procesalista Carnelutti en su obra Rivista di Diritto processuale civile, año 1929. Don Alfonso de Paula Pérez, La prueba de testigos en el proceso civil español (ed. Reus, Madrid, 1968, pág.7), añade: “y es que no sólo habla la voz viva. También hablan las expresiones mímicas: el color de las mejillas, los ojos, el temblor o consistencia de la voz, los movimientos, el vocabulario no habitual del testigo, son otras tantas circunstancias que deben acompañar el conjunto de una declaración testifical y sin embargo, todos estos elementos se pierden en la letra muda de las actas, *255 por lo que se priva al Juez de otras tantas circunstancias que han de valer incluso más que el texto de la declaración misma para el juicio valorativo que ha de emitir en el momento de fallar; le faltará el instrumento más útil para la investigación de la verdad: la observación.”
Al evaluar los testimonios, la Comisión dio crédito al testimonio de Pietri. Nuestra evaluación de la transcripción de la prueba nos mueve a avalar su criterio. Al hacerlo sopesamos el hecho de que Ruiz Rivera intervino en una vista de determinación de causa contra Pietri y la esposa de éste, y que otros testigos refutaron las declaraciones del principal testigo de cargo. Sin embargo, estos factores no nos mueven a alterar el criterio de la Comisión.
Aunque la defensa ha sostenido que el testimonio de Pietri no debe ser creído porque Ruiz Rivera tomó una determinación que le fue adversa en un caso previo, no nos parece que la mera determinación de causa probable en una vista preliminar haya motivado una faena de desprestigio insistente por parte de aquél contra éste. Se trata de una persona que ha tenido conflictos con la justicia, tanto en los tribunales de Puerto Rico como en los de Estados Unidos. No nos parece creíble que de todos los funcionarios del orden público que han intervenido con él (jueces, fiscales y policías), Pietri haya optado por iniciar una campaña de descrédito contra el magistrado que le determinó en vista preliminar causa para iniciar un juicio que nunca se celebró, pues eventualmente el caso penal se archivó. Si bien el testimonio de Pietri debe ser visto con cautela, no creemos que deba ser descartado totalmente por ese sólo hecho a base de conjeturas.
Tampoco nos parece que las alegadas contradicciones entre el testimonio de Pietri y el de los otros testigos de defensa deban tener el efecto de descartar como creíble las imputaciones de aquél, según sostiene el imputado.
Debe destacarse que algunas de las alegadas declaraciones contradictorias fueron prestadas por personas a quienes Pietri acusa de haber consumido sustancias controla *256 das con él. Por lo tanto, se trata de personas cuya reputación se hubiese visto afectada si confirmaban el testimonio de Pietri. Por ello, resultaba lógico, e incluso previsible, que declararan que el alegado consumo de cocaína nunca ocurrió.
Las otras posibles contradicciones relacionadas con ese primer encuentro —particularmente en cuanto al grado de iluminación del estacionamiento del “Hollywood Café” y la controversia en torno a la presencia de guardias privados en el local en donde ocurrió— no nos parecen significativas, pues no inciden sobre la veracidad del testimonio central.
Por su parte, la prueba testifical no revela que el testimonio de Pietri relacionado al encuentro entre éste y Ruiz Rivera en la cafetería “La Bodeguita del Medio” haya sido contradicho por testigo alguno. Al analizar la transcripción de la prueba oral notamos que los testigos de defensa sólo narraron que el día del alegado encuentro entre Ruiz Rivera y Pietri, aquél les expresó que se encontraba incómodo por la presencia de éste en el lugar. De este modo, las declaraciones vertidas en el proceso disciplinario consisten esencialmente en una repetición de lo que el propio Ruiz Rivera les dijo en “La Bodeguita del Medio”.
Al respecto, el dueño del local, Sr. Ángel Pellitsia, declaró que “ [e]l señor Juez estaba almorzando en el negocio ..., se paró y me dijo que se iba del negocio porque había una persona allí que no le agradaba su presencia por en-tender que era una persona de un pasado nebuloso”. (Enfasis suplido.) Transcripción de la prueba oral, pág. 310. De igual modo, el testimonio del Ledo. Juan E. Medina Quintana trata sobre lo que escuchó decir al juez al salir del local; en específico, sobre la incomodidad que éste expresó sentir por la presencia de Pietri. Id., pág. 405.
La contradicción, de haberla, estaría entre lo que Pietri declaró y lo que el querellado Ruiz Rivera dijo al dueño de “La Bodeguita del Medio”, no entre lo que Pietri dijo y lo *257 que los testigos observaron que ocurrió en el lugar, pues éstos no narran incidente alguno que hayan visto que contradiga directamente lo dicho por Pietri. No hay, pues, contradicción alguna.
Por otro lado, la defensa intentó demostrar con evidencia médica que Ruiz Rivera no era usuario de sustancias controladas. Distinto a la propuesta de la defensa, la prueba médica presentada sólo revela que al momento de las evaluaciones a las que fue sometido Ruiz Rivera no existía evidencia de que hubiera consumido sustancias controladas. Tampoco revelan si en los días especificados por Pietri, Ruiz Rivera en efecto las había consumido.
Superadas estas indagaciones, resolvemos que la prueba presentada satisface el quantum probatorio requerido para probar que Ruiz Rivera, siendo Juez Superior, consumió sustancias controladas.
No podemos pasar desapercibido el hecho de que el Informe de la Comisión de Disciplina Judicial fue avalado por ésta unánimemente. Fueron sus integrantes quienes tuvieron la oportunidad de evaluar de primera mano todos los testimonios vertidos y de ponderar las incongruencias. Luego de ello llegaron a la conclusión de que los hechos imputados fueron probados. Nosotros no intervendremos con esa determinación ante la ausencia de pasión, prejuicio, parcialidad o error manifiesto.
IV
Las disposiciones éticas invocadas para el ejercicio de nuestra jurisdicción disciplinaria son los Cánones I, X, XI, XXIV y XXVI de Ética Judicial de 1977 (4 L.P.R.A. Ap. IV-A).
Con excepción del Canon X, que claramente no aplica al presente caso, según lo concluyó la propia Comisión —véase Informe de la Comisión de Disciplina Judicial, *258 pág. 13—(2) los demás cánones imputados en el primer cargo al momento de la ocurrencia de los hechos disponían, en lo pertinente, lo siguiente:

Canon I. ...

La fe de un pueblo en la justicia, como valor esencial de la democracia, debe ser mantenida por los tribunales a los más altos niveles de la responsabilidad pública.
En el ejercicio de su delicada función, aquellas personas llamadas a impartir justicia, conscientes de la posición que ocupan en la sociedad y de la trascendencia de su misión, deben velar por que sus actuaciones respondan a normas de conducta que honren la integridad e independencia de su ministerio y estimulen el respeto y la confianza en la Judicatura.

Canon XI. ...

La Jueza o el Juez no solamente ha de ser imparcial sino que su conducta ha de excluir toda posible apariencia de que es susceptible de actuar a base de influencias de personas, grupos o partidos, o de ser influido por el clamor público, por consideraciones de popularidad o notoriedad, o por motivaciones impropias. ...

*259
Canon XXIV. ...

No es necesario ni deseable que la Jueza o el Juez viva en el aislamiento. Sin embargo, ha de ser escrupuloso en evitar actuaciones que razonablemente puedan dar lugar a la impresión de que sus relaciones sociales, de negocios, de familia o de amistad influyen en alguna forma en sus determinaciones judiciales.

Canon XXVI. ...

Los anteriores Cánones de Etica Judicial son normas mínimas de comportamiento que todo Juez y toda Jueza debe observar fielmente, tanto en su letra como en su espíritu, por ser consustanciales con el cargo judicial. Estos cánones no excluyen otras normas de conducta que también obligan al Juez y a la Jueza, que están establecidas por ley o que son inherentes al honor tradicional de la judicatura. 4 L.P.R.A. Ap. IV-A.
Nuestra evaluación de la prueba y de los cargos I y III nos convence de que los cánones precitados fueron violados. El primero de éstos, Canon I, supra, es un llamado general a los jueces, pero de ineludible cumplimiento, que procura que quienes imparten justicia fomenten con sus actuaciones públicas y privadas la estima pública en la Judicatura. Su contenido general se complementa con el Canon XXVI, supra, el cual incorpora entre los deberes éticos de los jueces normas no explícitas, pero cuyo cumplimiento es consustancial al fortalecimiento de la confianza pública en la Judicatura. Ambos cánones imponen a los jueces, de modo principal, el deber de cumplir con la ley, pues esta es una norma ética básica cuyo cumplimiento no podemos evadir si pretendemos que otros la acaten.(3) In re González Acevedo, 165 D.P.R. 81 (2005). Véase, además, In re Hon. Ferrán Quintana, 157 D.P.R. 622 (2002).
Por su parte, los Cánones XI y XXTV, supra, procuran, entre otras cosas, evitar que con sus actuaciones los jueces *260 den la impresión de que actúan a base de consideraciones ajenas a la prueba que se presenta en los procesos judiciales. Al respecto, la relación de amistad entre Ruiz Rivera y el principal testigo de cargo, persona cuya conducta delictiva era conocida, así como ciertas expresiones de aquél hechas a éste y creídas por la Comisión —relativas a que en la vista preliminar que presidió contra Pietri había mucha prueba, pero que “había sacado a su esposa absuelta”— promueven una impresión contraria a los valores que los precitados cánones de ética pretenden promover. Esas expresiones dan la impresión de que en sus determinaciones judiciales pueden mediar consideraciones ajenas a la prueba que le sea presentada.
Claramente, los referidos cánones fueron infringidos por Ruiz Rivera. No sólo violó la ley al consumir cocaína, como concluyó la Comisión, sino que siendo juez al momento de los hechos, lesionó la estima pública en la Judicatura. Su conducta amerita la sanción más enérgica que pueda imponer este Tribunal. Por ello, decretamos la destitución del querellado de su cargo de Juez Superior. Conforme con ello, resulta innecesario considerar las demás violaciones éticas imputadas en los cargos segundo y tercero.(4)

Se emitirá la correspondiente sentencia.

La Jueza Asociada Señora Fiol Matta disintió con una opinión escrita. El Juez Asociado Señor Rebollo López no interviene. El Juez Asociado Señor Fuster Berlingeri no intervino.

 El cuarto cargo imputado por la Oficina de Administración de los Tribunales expresaba:
“El Querellado incurrió en conducta impropia incompatible con su cargo al no informar en sus informes de actividad financiera extra judicial la existencia de un hijo procreado fuera de matrimonio y omitió toda información relacionada a sus obligaciones económicas con relación a tal hijo. Dicha conducta viola los Cánones de Ética Judicial I y X y a su Reglamento.” Informe de la Comisión de Disciplina Judicial, pág. 3.

 Este canon regula las actividades económicas de los jueces. Expresamente disponía:
“(a) El juez o la jueza no deberá prestar servicios extrajudiciales remunerados, excepto en actividades que no sean incompatibles con estos cánones y cuya prestación no afecte adversamente el fiel y diligente desempeño de sus labores y funciones judiciales. El Juez Presidente o la Jueza Presidenta podrá discrecionalmente, mediante dispensa a ser solicitada anualmente, autorizar dichos jueces o juezas a pres-tar tales servicios extrajudiciales.
“La fuente de dicha remuneración o la manera en que se hacen los pagos no debe dar base a la creencia de que se ejerce o pretende ejercer influencia indebida en el Juez o la Jueza. La remuneración recibida no debe exceder la que bajo iguales circunstancias correspondería razonablemente a una persona que no fuera miembro de la judicatura.
“(b) Todo juez o jueza deberá presentar anualmente, en o antes del 15 de marzo, un informe de divulgación de la actividad extrajudicial por la cual reciban remuneración, expresando la fecha, el lugar, el importe y el nombre de la persona jurídica que la satisfizo y de la actividad financiera suya y de su núcleo familiar, que cubra el año natural anterior. El Tribunal Supremo aprobará, mediante reglamento, las nor-mas sobre el contenido de dicha información de divulgación, las personas y actividad que el mismo cubrirá y el acceso a dicha información. Los jueces o las juezas del Tribunal Supremo, del Tribunal de Circuito de Apelaciones y del Tribunal de Primera Instancia, someterán sus informes al Secretario o a la Secretaria del Tribunal Supremo.” 4 L.P.R.A. Ap. IV-A, C. X.

 Los Cánones de Ética Judicial de Puerto Rico de 2005 establecen, en su Canon 1 (4 L.P.R.A. Ap. IV-B (Sup. 2006)), el deber ético de los jueces de cumplir con la ley. Véase In re Aprobación Cánones Ética 2005, 164 D.P.R. 403 (2005).

 El segundo cargo imputado contra Ruiz Rivera se relaciona con una declaración jurada que otorgó ante el juez Wilfredo Santos López, quien era su compañero juez en la Región Judicial de Ponce. En la declaración, en esencia, Ruiz Rivera expresó conocer a una persona de nombre Orlando González, quien se dedicaba al negocio de hojalatería, y que su relación con éste era estrictamente profesional. La declaración jurada fue suscrita por Ruiz Rivera al conocer que un funcionario había expresado que no le había solicitado una orden judicial para allanar el local de hojalatería de González, porque en ese momento reparaban allí el auto de aquél. La declaración jurada así suscrita, concluyó la Comisión, no fue hecha por Ruiz Rivera en el desempeño de sus funciones judiciales, lo que violaba disposiciones reglamentarias de la Oficina de Administración de los Tribunales. Véanse: Resolución de 25 de febrero de 1982 y Memorando Núm. 62 de 15 de mayo de 1982.