<table>
<tr><td colspan="2" align="center">Estado Libre Asociado de Puerto Rico<br>TRIBUNAL DE APELACIONES<br>PANEL ESPECIAL<br>OATA-2023-131</td></tr>
</table>

| EL PUEBLO DE PUERTO RICO<br><br>Apelado<br><br>v.<br><br>CHRISTIAN RODRÍGUEZ RIVERA<br><br>Apelante | KLAN202200975 | *Apelación,* procedente del Tribunal de Primera Instancia, Sala de Mayagüez<br><br>Caso Núm:<br><br>I1CR202000111, I SCR202100177 al 00184<br><br>SOBRE: ART. 93-A C. P. Y OTROS |
| --- | --- | --- |

Panel integrado por su presidenta, la Jueza Romero García, el Juez Monge Gómez y el Juez Cruz Hiraldo.[1]

Cruz Hiraldo, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de julio de 2024.

Comparece el apelante, Christian Rodríguez Rivera (en adelante, señor Rodríguez Rivera o apelante) y nos solicita que revoquemos la Sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de Mayagüez (TPI o foro primario), del 4 de noviembre de 2022. Mediante el referido dictamen, el TPI condenó al apelante a una pena de 143 años de reclusión. Ello, tras determinar culpabilidad de los delitos tipificados en los Artículos 93 (B) y 195 (A) del Código Penal de Puerto Rico, 33 LPRA secs. 5142, 5265 (en adelante, Código Penal), los Artículos 6.05 y Art. 6.14 de la Ley Núm. 168 de 11 de diciembre de 2019, conocida como la Ley de Armas de Puerto Rico de 2020, 25 LPRA secs. 466D y 466M (en adelante, Ley de Armas).

También resultó convicto por violación al Artículo 59 de la Ley Núm. 246 de 16 de diciembre de 2011 (en adelante, Ley de Maltrato

---

[1] Mediante la Orden Administrativa OATA-2023-131 se designa al Juez Joel A. Cruz Hiraldo en sustitución del Juez Abelardo Bermúdez Torres.

a Menores), el Artículo 3.2 (D) de la Ley Núm. 54 de 15 de agosto de 1989, conocida como la Ley para la Prevención e Intervención con la Violencia Doméstica (en adelante, Ley de Violencia Doméstica). Por último, el Artículo 6.14 (D) de la Ley del Departamento de Seguridad Pública de Puerto Rico, 25 LPRA sec. 3654 (en adelante, Ley de Seguridad Pública).

Por los fundamentos expuestos a continuación, confirmamos la *Sentencia* apelada.

**-I-**

Por los hechos acontecidos el 29 de marzo de 2020, en Mayagüez, Puerto Rico, el Ministerio Público presentó nueve (9) *Acusaciones* contra del señor Rodríguez Rivera por infracciones a los Artículos 93(B) y 195(A) del Código Penal, *supra*, los Artículos 6.05 y 6.14 de la Ley de Armas, *supra*, el Artículo Art. 59 de la Ley con el Maltrato a Menores, *supra*, el Artículo 3.2 (D) de la Ley de Violencia Doméstica, *supra*, y el Artículo 6.14 (D) de la Ley de Seguridad Pública de Puerto Rico, *supra.*

Luego de los trámites de rigor, el 8 de agosto de 2022, comenzó el juicio en su fondo. El Ministerio Público presentó como prueba de cargo los testimonio de: el Agente Carlos Lugo Méndez, el Agente José González Avilés, Jessica Rivera Santos (paramédico), el Agente Emilio Martínez Miranda, Dayanara Torres Denizard, Gloria Denizard Rodríguez, Xiomara Morales Suárez, la Agente Brenda Cartagena, la Agente Milagros Santiago, el Menor AVR, la Menor AVR -II-, el Agente Nelson González Quiñones, y la Dra. Rosa Marian Rodríguez Castillo (patóloga).

Asimismo, presentó prueba documental.[2]

---

[2] Véase Exposición Narrativa de la Prueba Oral, págs. 3-48. El Ministerio Público sometió múltiples Exbibits, entre ellos, los *Exhibits* A, B, C y los testimonios de las Agentes Milagros Santiago y Brenda Cartagena., los cuales fueron estipulados.

En lo aquí pertinente, se incluye un resumen de la prueba testifical que desfiló durante el juicio y que este Tribunal Revisor cuidadosamente examinó.

El primer testigo que presentó el Ministerio Público fue del Agente Carlos Lugo Méndez (en adelante, Agente Lugo). En corte abierta, el Agente Lugo declaró que, es agente de Servicios Técnicos del Negociado de la Policía de Puerto Rico. Indicó que el día de los hechos, lo asignaron a trabajar en una escena de agresión grave. A la cual, llegó con todo su equipo trabajo, y cerró el perímetro. En su declaración, el Agente Lugo, describió las fotos que tomó el día de los hechos, las cuales estaban marcadas en bloques, como *Exhibits* A, B y C.[3]

Durante el examen directo, el Ministerio Público, comenzó con la descripción del bloque C, el cual, detalló las características de la escena. Reseñó a cerca de las fotos C2, C3, C4, las cuales describían la parte exterior de la residencia. Además, explicó acerca de las fotos tomadas en el área superior de la propiedad, en específico, en el área del balcón y la ventana del segundo piso de la casa.[4]

En cuestión del bloque B, el Agente Lugo, describió las fotos tomadas desde el Centro Médico de Mayagüez. En las cuales capturó las heridas de Ashley Marie Rodríguez Denizard (en adelante, señora Rodríguez u occisa).[5]

Con respecto al bloque A, el Agente Lugo, tomó las fotos de un vehículo Toyota color rojo localizado en el área de la escena.[6]

Durante el contrainterrogatorio, el Agente Lugo, se refirió al *Exhibit* C79, explicó que muestra una puerta blanca cerrada, la cual está localizada en el primer piso de la casa, sostuvo que no mostró marcas compatibles con golpes o signos de violencia.

---

[3] Alegato del Pueblo de Puerto Rico, págs. 3-4.
[4] Alegato del Pueblo de Puerto Rico, pág. 4.
[5] Fotos B2, B6, B7, B8, B11, B14, B17, B40, B42, B43, B52.
[6] Alegato del Pueblo de Puerto Rico, pág. 5.

En torno al *Exhibit* C68, relató que era la puerta, localizada en el segundo piso de la casa, la cual tenía un pedazo de madera que tapaba una ventana.[7] Finalmente, en el redirecto, el Agente Lugo, describió al *Exhibit* C80, en el cual detalló a cerca de la iluminación de la casa y en el área de la escena.

El segundo testigo que presentó el Ministerio Público fue el Agente José González Avilés (en adelante, el Agente González). A preguntas de la fiscal en el examen directo, el Agente González, declaró que allá para el 29 de marzo de 2020, recibió una querella a cerca de una persona herida de bala. Explicó, que fue asignado a proteger la escena, y al llegar se encontró con los agentes Ángel Ayala Abreu y Emilio Martínez Miranda. Aseguró que nadie tuvo acceso a la escena previo a la llegada de los agentes de la división de Homicidios.[8]

El tercer testigo que presentó el Ministerio Público fue la señora Jessica Rivera Santos (en adelante, señora Rivera) quien es paramédico de profesión. Testificó que, el 29 de marzo de 2020, recibió una llamada a través del sistema de emergencia 9-1-1 sobre una persona herida de bala. Añadió que, entre las 8:00 pm y 8:11 pm, se detuvo frente a la ambulancia un caballero, y se bajó con la occisa en los brazos. La testigo explicó que, la señora Rodríguez estaba inconsciente, con mucha sangre, con heridas en las manos y las piernas. Añadió que, la occisa en ese momento tenía signos vitales, sin embargo, no respondía.[9]

El cuarto testigo del Ministerio Público fue el Agente Emilio Martínez (en adelante, Agente Martínez). Durante su testimonio, expresó que, el 29 de marzo de 2020, estaba patrullando la zona, cuando recibió una llamada por el sistema de emergencia 9-1-1

---

[7] *Íd.*
[8] *Íd.*
[9] *Íd.*

sobre una persona herida de bala. Detalló que, identificó una ambulancia cerca del área de Castillo, en la salida de la iglesia a la Carretera 114. Explicó que ahí estaba la occisa, recibiendo asistencia de paramédicos en la ambulancia. Expresó que, luego se dirigió, hacia la escena y manifestó que había casquillos de balas desde la entrada de la casa hasta el área en donde cayó la occisa.[10] El testigo declaró que luego se dirigió al Centro Médico de Mayagüez, en donde, encontró a la señora Rodríguez, recibiendo asistencia médica. Agregó que, alrededor de las 10:00 pm certificaron su muerte.[11]

El quinto testigo que presentó el Ministerio Publico fue Dayanara Torres Denizard (en adelante, la señora Torres). La señora Torres declaró que, conocía a la occisa, porque era su hija y tenía veinte y ocho (28) años. Mencionó que, conoció al señor Rodríguez Rivera porque fue la pareja la señora Rodríguez, por un año o año y medio. Además, manifestó que la señora Rodríguez, al momento de fallecer tenía tres (3) hijos, menores de edad.[12]

La testigo declaró que, el 29 de marzo de 2020, estuvo con la occisa en casa de su mamá. Según relató, ese día, la occisa le manifestó que estaba ¨preocupada¨, ya que el día antes, "había ido a buscar su carro, y el señor Rodríguez Rivera le quitó su teléfono. El cual ella necesitaba para los trámites de los niños y las clases por la pandemia". La testigo indicó que durante esa conversación la señora Rodríguez le pidió que llamara al apelante y le solicitara su teléfono.[13]

Así pues, la señora Torres, llamó al apelante y solicitó el teléfono de la occisa. A lo que, el señor Rodríguez Rivera, contestó

---

[10] El Agente Martínez en su testimonio hizo referencia al *Exhibit* C77, explicó que el cuerpo de la occisa estaba cerca de un vehículo rojo, y pudo ver casquillos e impactos de balas en el área del vehículo. Además, identificó el *Exhibit* C79, como el área en donde se encontró el cuerpo de la occisa con manchas de sangre.

[11] Alegato del Pueblo de Puerto Rico, pág. 6.

[12] Exposición Narrativa de la Prueba Oral de 9 de agosto de 2022, pág. 3.

[13] Exposición Narrativa de la Prueba Oral de 9 de agosto de 2022, pág. 5.

que "no iba a devolver nada porque su hija era una puta, que no valía nada y que, si la cogía [con] un macho la iba a matar".[14] La testigo indicó que el apelante, repitió que la iba a matar, en más de cinco (5) o seis (6) ocasiones con un tono de voz bastante tranquilo.[15]

La señora Torres, expresó que, la conversación con el apelante duró alrededor de cinco (5) minutos y qué, le solicitó el teléfono de la occisa en al menos cinco (5) o seis (6) ocasiones.

Según la señora Torres, antes de culminar la llamada, le explicó al apelante que ¨su hija lo único que quería era un hogar con estabilidad y amor¨. A lo que el señor Rodríguez Rivera, contestó que, "ella no valía nada". La testigo le pidió que dejara a su hija tranquila, y éste, contestó ¨te voy a matar a tu hija, si la cojo con un macho¨ y colgó la llamada.[16]

La señora Torres, prosiguió relatando que, ese día no habló con su hija de la conversación que tuvo con el apelante, porque, ya casi era hora del toque de queda y tenía que regresar a su casa. Sin embargo, se quedó con la preocupación, y llamó al celular de su nieto. Finalmente, logró hablar con su hija, y le indicó que se encerrara con sus hijos en su casa.

La testigo declaró, que tiempo después, recibió una llamada, en la cual le indicaron que, ¨algo había sucedido en casa de su mamá". Expresó que, cuando llegó a la escena vio a la occisa tirada en el piso, y ésta le dijo ¨mami sálvame, por favor¨.[17]

En su testimonio la señora Torres, describió a la occisa como, tirada en la hierba, con los ojos bien abiertos, con sangre por muchas partes del cuerpo y temblorosa. La testigo relató que, no pudo esperar por la ambulancia, por lo cual, montó a la occisa en la guagua, con el propósito de llevarla al hospital. Sin embargo, a las

---

[14] Exposición Narrativa de la Prueba Oral de 9 de agosto de 2022, pág. 6.
[15] *Íd.,* líneas 15-16.,
[16] *Íd.,* líneas 3-4.
[17] *Íd.,* líneas 11-12.

afueras de la calle de Castillo, vio a la ambulancia y le hizo señas. La ambulancia paró en unión a una patrulla, y se llevó a la señora Rodríguez al Centro Médico de Mayagüez.[18]

La señora Torres declaró que, esperó en el hospital alrededor de una hora. Luego, un agente la llamó al área de los bancos y le informó que su hija falleció. La testigo relató que, no recuerda a cuál policía le brindó la información de su hija. Además, expresó que, a preguntas del policía, le indicó que desconocía del paradero del señor Rodríguez Rivera.

El sexto testigo del Ministerio Público fue Gloria Denizard Rodríguez (en adelante, la señora Denizard). La señora Denizard declaró que la occisa era su nieta y que, conocía al señor Rodríguez Rivera porque fue pareja de la occisa por espacio de un año.[19] Durante su testimonio expresó que, allá para el 29 de marzo de 2020, su nieta vivió en los bajos de su casa por alrededor de una semana. Mencionó que, no se encontraba en su casa al momento de los hechos, pero que, al llegar, supo que le habían disparado a su nieta y ésta se encontraba en Centro Médico.[20]

A preguntas de la Defensa, la señora Denizard, describió su propiedad como una de dos pisos, con un apartamento en el primer nivel, una entrada por el lado y un balcón.

En cuestión del alumbrado, la testigo, explicó que, había un foco grande que brindaba iluminación. En el examen de redirecto la testigo, la brindó la ubicación del foco.

El séptimo testigo del Ministerio Público fue Xiomara Morales (en adelante, la señora Morales). Durante el juicio testificó que, conocía al señor Rodríguez Rivera porque era expareja de su amiga, la señora Rodríguez.[21] Mencionó que, la occisa llevó una relación

---

[18] *Íd.,* líneas 17-22.
[19] Exposición Narrativa de la Prueba Oral de 9 de agosto de 2022, pág. 6-7.
[20] Exposición Narrativa de la Prueba Oral de 9 de agosto de 2022, pág. 8.
[21] Exposición Narrativa de la Prueba Oral de 9 de agosto de 2022, pág. 14, líneas 1-5.

consensual con el apelante por alrededor de un año. Añadió que, por ¨Facebook¨, parecían felices. La testigo declaró que, el 29 de marzo de 2020, escuchó unas detonaciones, y cuando se enteró que la señora Rodríguez fue herida de bala, salió corriendo para su casa. Añadió que, al llegar trató de darle asistencia médica porque es enfermera.

A preguntas de la Defensa, la señora Morales, aseguró que, desde su casa hasta el lugar de los hechos, no encontró al señor Rodríguez Rivera, ni vio vehículo alguno que pudiera entender que se refería a él.

En el examen del redirecto, la testigo explicó que, hay otras carreteras por la residencia del lugar de los hechos que conducen a distintas direcciones incluyendo la Carretera 114. Añadió que, por la dirección desde donde ella venía no pudo ver lo que ocurrió en esas otras carreteras.[22]

El octavo testigo del Ministerio Público fue el menor AVR (en adelante, menor AVR). El menor AVR declaró que, tiene diez (10) años y que, la señora Rodríguez era su mamá. Relató que la última vez que la vio con vida a la occisa fue el día que el señor Rodríguez Rivera ¨la asesinó¨.[23] Expresó que, conocía al apelante, debido a que, fue su padrastro por dos años o más, y que vivió con él, en el Residencial del Carmen, junto a su mamá y sus hermanitas.[24] Continuó declarando que, conocía al apelante por el apodo de ¨Christian bala¨. Añadió que, por problemas en la relación entre su mamá y él, se mudaron con su abuela a Castillo.[25]

---

[22] Exposición Narrativa de la Prueba Oral de 9 de agosto de 2022, pág. 25, líneas 1-7.
[23] Exposición Narrativa de la Prueba Oral de 10 de agosto de 2022, pág. 28, líneas 9-10.
[24] *Íd.,* líneas 12-14.
[25] *Íd.,* línea 15.

A preguntas de la fiscal el testigo manifestó que vio maltrato, como halones de pelo, cuando vivía en el Residencial El Carmen y el día que la mató.[26]

Sobre el día de los hechos, el testigo declaró que, estaba en la sala, su hermana en la cocina y su mamá en el cuarto. Explicó que, de momento llegó el apelante y se asomó por la ventana. Relató que, el señor Rodríguez Rivera, tenía un arma de fuego, la cual describió como negra y apuntando a su mama.[27] Expresó que, la occisa se encontraba en la cama, y que, el apelante le dijo que, "eso le va a pasar por puta". Añadió que, la occisa le gritó ¨frente a los nenes, no¨. El menor AVR expresó que, se llevó a sus hermanas para que no vieran y el apelante no les hiciera daño.[28] Relató que, las sacó a afuera y él se quedó en la puerta.

Añadió que, pudo observar cuando el apelante golpeó a su mamá en la cabeza en más de cuatro (4) ocasiones en el área del fregadero de la cocina, la sacó de la casa, y le disparó unas ocho (8) o diez (10) veces hasta que la occisa cayó al suelo y tenía disparos en el área de los muslos.[29] A su vez, declaró que, luego de dispararle a su mamá, el apelante salió corriendo y se montó en un vehículo Yaris, color azul, chocado. Sostuvo que, conocía el auto del apelante, ya que, él se había montado en varias ocasiones.[30]

A preguntas de la Defensa el menor AVR contestó que, había un foco prendido en el área donde el apelante le disparó a su mamá. Añadió que, pudo ver los tiros en el área de los muslos de la occisa y que el apelante le había dicho en más de una ocasión a su mamá ¨puta¨.[31]

---

[26] *Íd.,* líneas 27-30.
[27] *Íd.,* líneas 37-39.
[28] Exposición Narrativa de la Prueba Oral de 10 de agosto de 2022, pág. 30, líneas 3-6.
[29] *Íd.,* líneas 17-28.
[30] Exposición Narrativa de la Prueba Oral de 10 de agosto de 2022, pág. 31, líneas 1-2.
[31] Exposición Narrativa de la Prueba Oral de 10 de agosto de 2022, pág. 32, líneas 1-2.

El noveno testigo del Ministerio Público fue la menor AVR-II- (en adelante, la menor AVR-II-). Durante el examen directo declaró que, tiene diez años y que tiene tres hermanos.[32] Reconoció a la señora Rodríguez como su mamá y aseguró que el último día que la vio con vida fue el día en que la mataron.[33] Manifestó que conoce al señor Rodríguez Rivera porque era el novio de su mamá, y es conocido como, "Christian bala".[34]

La menor AVR-II- detalló que allá para el día 29 de marzo de 2020, ¨su mamá se había dejado de Christian y éste no la quería. Añadió que, el apelante llegó a la casa y apuntó a su mamá con un arma a través de la ventana. La testigo expresó que, el señor Rodríguez Rivera, abrió la puerta, y se llevó a su mamá al lavamanos y empezó a darle puños y halarle el pelo. Aclaró que el lavamanos queda en el área de la cocina. Agregó que, luego de ello, el apelante se llevó a su mamá hasta el piso de afuera que tenía plantas.

La menor AVR -II- sostuvo que, el apelante arrastró a su mamá, y en ese momento le disparó.[35] La testigo continuó declarando que, luego de disparar el apelante salió corriendo. Relató que, la última que vio a su mamá fue cuando se la llevaron, y tenía un paño rojo en la pierna para no sangrar.[36]

A preguntas de la Defensa, la testigo, aseguró que el seguro de la puerta no servía. Aclaró que, lo ocurrido en el área de la cocina, ella no lo vio, sino que, se lo contaron. Aseguró que, desde una ventana en el segundo piso, pudo ver, cuando el apelante haló por el pelo a la occisa, ésta se cayó y él comenzó a dispararle, mientras

---

[32] Exposición Narrativa de la Prueba Oral de 10 de agosto de 2022, pág. 36, línea 30.
[33] *Íd.,* línea 31.
[34] *Íd.,* línea 32.
[35] *Íd.*, líneas 34 -35.
[36] Exposición Narrativa de la Prueba Oral de 10 de agosto de 2022, pág. 37, líneas 12-13.

ella pedía ayuda. Por último, sostuvo que había una luz prendida en el área.[37]

El décimo testigo del Ministerio Público fue el Agente Nelson González Quiñones (en adelante, Agente González Quiñones). En corte abierta, el testigo hizo constar que es el Agente González Quiñones, adscrito a la División de Homicidios de Mayagüez hace aproximadamente seis (6) años.[38] Durante su testimonio, declaró que, el 29 de marzo de 2020, recibió una llamada, a través del sistema de emergencia 9-1-1 para investigar una querella de agresión agravada. En donde había una persona herida de bala en el Centro Médico de Mayagüez.[39]  Indicó que esa noche, llegó al hospital junto al Sgto. Aníbal Lugo. Relató que al llegar se entrevistó con el Agente Martínez, quien le informó que, había una dama herida de bala, la cual, había sido identificada por su madre, como la señora Rodríguez.[40] Continuó declarando que, en el hospital le informaron que la señora Rodríguez falleció a las 10:07pm, a consecuencia de los disparos que había recibido. Indicó que, acto seguido le comunicó la noticia a la señora Torres.[41]

El agente González Quiñones declaró, que pudo observar el cuerpo de la occisa, ya sin vida, que estaba boca arriba, tenía parchos en los muslos, un tubo en el área de la boca y el equipo médico puesto.[42] Además, indicó que pudo observar aproximadamente nueve (9) heridas, entre ellas, en la parte posterior del cuello, hombro derecho, en cada muslo, en la rodilla derecha, en la pantorrilla, sobre el glúteo derecho, y debajo del glúteo izquierdo.[43]

---

[37] *Íd.,* líneas 17 -29.
[38] Exposición Narrativa de la Prueba Oral de 11 de agosto de 2022, pág. 39, línea 6.
[39] *Íd.*, líneas 8-13.
[40] *Íd.,* líneas 22-25.
[41] Exposición Narrativa de la Prueba Oral de 11 de agosto de 2022, pág. 40, línea 20.
[42] *Íd.*, líneas 24-27.
[43] En el examen directo, el agente, describió los siguientes *Exhibits,* B54, el cual hace descripción de la entrada del hospital y el vehículo de servicios técnicos. El

El testigo expresó que recopiló la información médica. Añadió que, según el médico de turno, la paciente llegó en un delicado estado de salud con múltiples heridas de balas. Agregó que, el galeno le informó que hicieron todo para salvarla pero que no fue posible por las heridas que recibió.[44]

Además, el Agente González Quiñones declaró que, salió del hospital a eso de las 11:15 pm y llegó a la escena a las 11:19 pm. Indicó que, la escena estaba custodiada por agentes del orden público. El testigo manifestó que, observó una residencia de dos plantas con un vehículo rojo y dos guaguas.[45]

El agente González Quiñones explicó que, al llegar al lugar de los hechos, hizo una búsqueda de forma lineal para identificar evidencia, por lo que en el área de la grama ocupó ocho (8) casquillos de bala calibre cuarenta. Agregó que, identificó un vehículo, el cual, tenía un impacto de bala y una mancha roja. Expreso que, había blindaje al lado derecho del auto, y alumbrado eléctrico, en la parte posterior de la casa, en unión a un poste.[46] El agente informó que, tomó fotos de la escena, sin embargo, no ocupó ningún arma de fuego.[47]

Añadió que, entrevistó a la señora Denizard, quien es la dueña de la casa, al tío, a la prima y al novio de la prima de la occisa.[48]

En cuanto a la descripción de la residencia, el Agente González Quiñones, declaró que, en el área de la cocina había una ventana con cortina. En el segundo nivel, había una puerta de aluminio con tres cristales, y pudo corroborar que desde ese ángulo

---

B53, describió el cuerpo de la señora Rodríguez, sin ropa, tatuajes y tubo en la boca. El B50, cuerpo de la señora Rodríguez, sin vida. B9, cuerpo de la señora la Rodríguez en la camilla boca arriba y el B10, la señora Rodríguez con un tubo en el costado y parchos que tapan las heridas.

[44] Exposición Narrativa de la Prueba Oral de 11 de agosto de 2022, pág. 42 líneas, 5-9.

[45] *Íd.,* líneas 10-15.

[46] *Íd.,* líneas 22-35.

[47] Exposición Narrativa de la Prueba Oral de 11 de agosto de 2022, pág. 44 líneas, 3-5.

[48] *Íd.,* líneas 7-11.

de la puerta se veía hacia vehículo de la occisa y el área de la grama.[49]

El testigo relató que el día después, el 30 de marzo de 2020, entrevistó a la señora Morales, y a los hijos de la señora Rodríguez.

Según, el Agente González Quiñones, la señora Morales declaró que al escuchar las detonaciones pensó en la occisa, la llamó y quien contestó fue el apelante. Testificó que, la señora Morales solicitó hablar con ¨Beba¨ (así la conocía) y el apelante le expresó, la maté. Al enterarse que la occisa estaba herida, la señora Morales corrió a su casa y al verla en el suelo, trató de darle los primeros auxilios a su amiga.

El agente declaró que el testimonio de la señora Morales fue en fiscalía y mediante declaración jurada, la cual, leyó y firmó, en presencia del Agente González Quiñones y la Fiscal.[50]

En su testimonio el Agente González explicó que, luego de las entrevistas y la evaluación del caso, éste, concluyó que el apelante fue quien disparó y asesinó a la señora Rodríguez.[51]

Así las cosas, ese mismo día, comenzó la búsqueda del señor Rodríguez Rivera por el Residencial El Carmen. Sin embargo, no hallaron al apelante. Por lo que, el caso, se sometió en ausencia.

Finalmente, el 14 de abril de 2020, agentes especiales, llevaron a cabo el arresto del señor Rodríguez Rivera, en el municipio de Hormigueros.[52] Consecuentemente, el 15 de abril del 2020, el Agente González Quiñones, entrevistó al apelante, el cual, decidió ejercer su derecho a permanecer en silencio.[53]

A preguntas de la Defensa, el Agente González Quiñones, declaró que no verificó por dónde, abre la puerta de la casa. Además,

---

[49] *Íd.,* líneas 19-26.
[50] *íd.,* líneas 13-17.
[51] Exposición Narrativa de la Prueba Oral de 11 de agosto de 2022, pág. 47 líneas, 10-12.
[52] *íd.,* líneas 13-18.
[53] *íd.,* líneas 19-20.

en el contrainterrogatorio, se cuestionó el hecho de que no hay alguna foto que muestre la puerta y el cristal, por donde, el menor AVR, alegó que observó los hechos.[54] A lo que, el Agente González Quiñones, contestó que, no capturó fotografías de la puerta, sin embargo, corroboró la visibilidad del área en la escena.

El undécimo testigo del Ministerio Público fue la Dra. Rodríguez (en adelante, Dra. Rodríguez). La testigo declaró que su nombre es Rosa Marian Rodríguez Castillo y es patóloga hace veintiocho 28 años.[55]

Expresó que, hizo la autopsia de la señora Rodríguez, el 1 de abril de 2020, para determinar la causa y manera de la muerte. Relató que, documentó cómo llegó el cuerpo a través fotos y documentos, en donde, plasmó las lesiones médicas y traumáticas del cuerpo y, por último, tomó radiografías.[56]

Declaró que, los hallazgos de trauma externo en la occisa fueron cinco heridas de bala. Las cuales se desglosan en ABCDE.[57] En cuanto a la herida A, la describió anterior y superior al hombro derecho.[58] La herida B, indicó que, estuvo localizada en el área anterolateral del muslo derecho.[59] La herida C, la identificó en el área anterolateral de la pierna derecha[60] La herida D, entró en la piel, en el área muscular, perforó la vena femoral izquierda, y salió por el glúteo izquierdo.[61] La herida E, fue ubicada en la parte posterior del cuello.[62]

---

[54] Exposición Narrativa de la Prueba Oral de 11 de agosto de 2022, pág. 49 líneas, 9-15.
[55] Exposición Narrativa de la Prueba Oral de 12 de agosto de 2022, pág. 55 líneas, 15-16.
[56] *Íd.*, líneas 29-33.
[57] Exposición Narrativa de la Prueba Oral de 12 de agosto de 2022, pág. 56 líneas, 11-12.
[58] *Íd.*, líneas 13-27.
[59] *Íd.*, líneas 36-39.
[60] Exposición Narrativa de la Prueba Oral de 12 de agosto de 2022, pág. 57 líneas, 5-7.
[61] *Íd.*, líneas, 9 13.
[62] *Íd.*, líneas 26-27.

La testigo indicó que las heridas ABCE se describen como aquellas que, no tienen tatuaje. Es decir, fueron propinadas a una distancia menor de dos 2 pies. Además, expresó que, la herida D, presentó humo negro. Explicó que, esto significa que la bala fue propinada a una distancia menor de dos pies en el área del muslo.[63]

En cuestión del área de la cabeza, la testigo indicó que, hay una hemorragia subgaleal, lo que cubre la bóveda craneal y presenta un poco de hemorragia.[64] Añadió que, los hallazgos de sangrado subgaleal son compatibles, a que la occisa, tuvo contacto con un objeto. Por lo tanto, no se puede descartar que la señora Rodríguez tuvo contacto con un objeto o una mano, sin embargo, no hubo daño o fractura craneal.[65]

Consecuentemente, la testigo declaró en cuanto a la forma en que la señora Rodríguez, recibió las municiones. Explicó que conforme las heridas ABCE, se tiene que considerar que la persona se va a mover. En cuanto a la herida A, indicó que la víctima pudo haber recibió la bala parada o inclinada. Además, indicó que, en cuanto a las otras heridas la occisa estaba en un plano superior.[66]

La testigo declaró que la conclusión y causa de muerte es herida de bala, homicidio sin explicación jurídica.[67] La testigo declaró que no realizó examen de ADN a la occisa, y solo obra en el expediente la prueba de balística.[68]

Finalmente, declaró que, la muerte fue, el 29 de marzo de 2020, a las 10:07pm.[69]

Sometida la prueba testifical y documental, el 12 de agosto de 2022, el foro primario mediante tribunal de derecho encontró

---

[63] *Íd.,* líneas 13-17.
[64] *Íd.,* líneas 27-29.
[65] *Íd.,* líneas 32-35
[66] *Íd.,* líneas 37-38.
[67] Exposición Narrativa de la Prueba Oral de 12 de agosto de 2022, pág. 57 líneas, 3-4.
[68] Exposición Narrativa de la Prueba Oral de 12 de agosto de 2022, pág. 59 líneas,13-14.
[69] *Íd.,* líneas, 15-16.

culpable al apelante por todos los delitos imputados. El 4 de noviembre de 2022, el TPI sentenció al señor Rodríguez Rivera a una pena de total de reclusión de 143 años.[70]

Inconforme, el 5 de diciembre de 2022, el señor Rodríguez Rivera acudió ante esta Curia mediante *Apelación Criminal* y señaló la comisión de los siguientes errores:

> ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL EMITIR UN FALLO DE CULPABILIDAD EN TODAS Y CADA UNA DE LAS ACUSACIONES PRESENTADAS, ANTE UNA PRUEBA QUE NO DERROTÓ LA PRESUNCIÓN DE INOCENCIA Y NO ESTABLECIÓ LOS ELEMENTOS DE LOS DELITOS MÁS ALLÁ DE DUDA RAZONABLE.

> ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL EMITIR UN FALLO DE CULPABILIDAD A PESAR DE NO HABERSE PRESENTADO PRUEBA QUE TENDIERA A IDENTIFICAR AL ACUSADO Y ESTABLECER SU CONEXIÓN CON EL RESULTADO DELITIVO MÁS ALLÁ DE DUDA RAZONABLE.

Cabe destacar que, en el transcurso del perfeccionamiento del *Recurso Apelativo* acontecieron varios incidentes que provocaron su retraso.[71]

---

[70] El TPI impuso al apelante una pena de noventa y nueve (99) años por los delitos de asesinato en primer grado, maltrato de menores, escalamiento agravado y Art. 3.2 (D) de la Ley Núm. 54-1989, *supra*, a cumplirse de forma concurrente entre sí, tomando en consideración la reincidencia habitual. Además, quince (15) años de cárcel por infracción al Art. 6.05 Ley de Armas, duplicado a tenor con lo dispuesto en el Art. 6.01 de la Ley 168, a treinta (30) años de cárcel consecutiva con el Art. 6-14-A Ley 168, *supra*, y siete (7) años, duplicado a tenor con lo dispuesto en el Art. 6.01 de la Ley 168, a catorce (14) años de cárcel. Para un total de ciento cuarenta y tres (143) años de reclusión.

Por otra parte, el TPI ordenó, el pago de la pena especial (Fondo de Compensación a Victimas de Delito), según mandata el Art. 61 del Código Penal de 2012, 33 LPRA sec. 5094.

[71] El apelante presentó el 9 de diciembre de 2022, un documento intitulado, *Moción Informativa conforme a la Regla 29 y Solicitud de Primera Prórroga Conforme la Regla 72 del Reglamento del Tribunal de Apelaciones.*

En atención a dicha *Moción,* emitimos *Resolución* el 16 de diciembre de 2022.

Luego, el 8 de febrero de 2022, el apelante presentó una *Moción Urgente Informativa Sobre Regrabación de Juicio Ininteligible y Prórroga.* De la cual, emitimos *Resolución,* el 8 de febrero de 2022.

El 9 de febrero de 2024, el TPI, presentó *Moción de Comparecencia Especial y Certificación.* El 6 de marzo de 2023, emitimos *Resolución*, ordenando a las partes, en un término no mayor de 20 días, a reunirse para preparar una *Exposición Narrativa* de la prueba vertida en sala el 8 de agosto de 2022.

El 25 de abril de 2023, el TPI, presentó un documento intitulado, *Comparecencia Especial.* El 2 de mayo emitimos *Resolución,* concediendo un término de 30 días, a las partes para presentar sus respectivos alegatos.

El 9 de mayo de 2023, el apelante presentó una *Moción Informativa y Solicitud de Prórroga Conforme la Regla 72 del Reglamento del Tribunal de Apelaciones para Presentar Transcripción Estipulada de la Prueba.*

El 15 de mayo de 2023, el Pueblo de Puerto Rico, presentó una *Solicitud de Relevo de Resolución.*

Tras la concesión de varias prórrogas, el 2 de febrero de 2023, el apelante presentó la *Exposición Narrativa de la Prueba Oral Estipulada* de los días 9,10,11 y 12 de agosto 2022.

Así las cosas, el 20 de febrero de 2024, el apelante presentó su *Alegato Suplementario*.

En consecuencia, el 19 de mayo de 2024, el Pueblo de Puerto Rico presentó su *Alegato* en oposición a la Apelación.

Tras los trámites procesales de rigor conducentes a obtener la *Exposición Narrativa de la Prueba Oral* y presentados los alegatos de las partes, procedemos a adjudicar la controversia bajo los fundamentos que exponemos a continuación.

-II-

A.

La Constitución del Estado Libre Asociado de Puerto Rico garantiza a todo acusado de delito el derecho fundamental a la presunción de inocencia. Const. PR, art. II, § 11. *Pueblo v. Laureano*, 206 DPR 963, 967 (2021). Por tanto, "se presume que todo acusado es inocente, hasta tanto se pruebe lo contrario más allá de duda razonable". Regla 110 de Procedimiento Criminal.[72]

Es norma trillada en el derecho procesal criminal que el Ministerio Público tiene el peso de rebatir esa presunción mediante

---

El 16 de mayo de 2023, emitimos *Resolución*, concediendo al apelante, un término final e improrrogable de 30 días para cumplir con su deber de presentar la reproducción de la prueba oral.

El 16 de mayo de 2023, el apelante, presentó *una Moción Urgente Informativa Sobre Presentación de Petición de Nuevo Juicio al Amparo de la Regla 188 (E) y (F) Ante el Tribunal de Primera Instancia de Mayagüez y Solicitud de Paralización de Asuntos Ante el Tribunal de Apelaciones Mientras se Atiende la Misma.* El 22 de mayo de 2023, emitimos *Resolución*, paralizando los procedimientos ante este foro apelativo.

El 26 de septiembre de 2023, se declaró *No ha Lugar*, la solicitud de un Nuevo Juicio y, este, foro revisor el 22 de mayo de 2023, emitió *Resolución* para la continuación de los procedimientos.

El 5 de diciembre de 2023, el apelante, presentó una *Moción Informativa Presentación de Proyecto de Exposición Narrativa al Amparo de la Regla 76.1 del Reglamento del Tribunal de Apelaciones y la Regla 200 de Procedimiento Criminal.* El 5 de diciembre de 2023, el Pueblo de Puerto Rico, presentó una *Solicitud de Término Para Revisar Exposición Narrativa.* En atención a ello, emitimos *Resolución*, concediendo hasta el 28 de diciembre de 2023, para que las partes revisen la *Exposición Narrativa de la Prueba Oral.*

[72] 34 LPRA Ap. II, R.100.

la presentación de evidencia que establezca la culpabilidad del acusado más allá de duda razonable, sobre todos los elementos del delito y la conexión con el acusado. *Pueblo v. Henríquez Rivera,* 124 DPR 623, 629 (2020).

Nuestro Máximo Foro en *Pueblo v. De Jesús Mercado,* 188 DPR 467, 477 (2013) nos explica que no basta con que el Fiscal presente prueba que sea meramente suficiente. Se requiere "para rebatir la presunción de inocencia [...] prueba satisfactoria y suficiente en derecho, es decir, que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido". Sin embargo, "[e]sto no significa que la culpabilidad del acusado debe demostrase con certeza matemática o que se debe descartar toda duda plausible [...] la duda razonable que motiva la absolución del acusado es aquella que causa insatisfacción o intranquilidad ante la prueba de cargo, luego de que ésta fue evaluada en su totalidad de forma justa, imparcial y serena". *Pueblo v. Henríquez Rivera, supra,* pág. 323.

**B.**

La Regla 110 de Evidencia establece el criterio rector a seguir con respecto al estándar de evaluación y suficiencia de la prueba.[73] Según dispone la Regla, "cualquier hecho puede probarse mediante evidencia directa o mediante evidencia indirecta o circunstancial".

La evidencia directa es aquélla que prueba directamente el hecho en controversia.[74] En cambio, la evidencia indirecta o circunstancial es aquélla que tiende a demostrar el hecho en controversia probando otro distinto, del cual – junto a otros ya establecidos- puede razonablemente inferirse el hecho en controversia.[75]

---

[73] Regla 110 de Evidencia, 32 LPRA Ap. VI.
[74] *Íd.*
[75] *Íd.*

En cuestión de la prueba testimonial nuestro más Alto Foro ha expresado que la evidencia directa de un testigo que merezca entero crédito es prueba suficiente de cualquier hecho [...]. Así pues, el testimonio de éste de ser creído puede ser suficiente en derecho para sostener un fallo condenatorio aun cuando dicho testimonio no fuera perfecto. *Pueblo v. Chévere,* 130 DPR 103, 113 (1995).

## C.

Es norma conocida que, toda persona es apta para ser testigo, salvo disposición legal en contrario.

Así lo demuestra la Regla 601 de Evidencia, al disponer que, toda persona podrá servir como testigo, a menos que, sea incapaz de expresarse en forma tal que pueda ser entendida – por sí o mediante interprete- con relación al asunto sobre el cual declararía, o sea incapaz de comprender su obligación de testificar la verdad. 32 L.P.R.A. Ap. VI, R. 601. Por ende, la objeción de una parte respecto a un testigo estará dirigida a la capacidad testifical de éste, o a la credibilidad de su testimonio.

Por otro lado, es rol de la persona testigo declarar sobre la materia de la cual tenga conocimiento personal. 32 L.P.R.A. Ap. VI, R. 602. Ante ello, su declaración en forma de opiniones o inferencias se limitará a aquéllas que:

> ¨(a) estén racionalmente fundadas en la percepción de la persona testigo,
> (b) sean de ayuda para una mejor comprensión de su declaración o para la determinación de un hecho en controversia, y
> (c) no estén basadas en conocimiento científico, técnico o cualquier otro conocimiento especializado dentro del ámbito de la Regla 702. 32 L.P.R.A. Ap. VI, R.701¨.

En lo pertinente a la capacidad testifical de los niños, el profesor Ernesto L. Chiesa Aponte ha expreso que, según las reglas de evidencia, la edad de un niño no es impedimento para testificar. Ahora bien, siempre y cuando pueda hacerlo inteligiblemente y

comprenda su obligación de decir la verdad. E. L. Chiesa Aponte, Compendio de Evidencia (En El Sistema Adversarial), Ciudad de México, 2021, pág. 110.

**D.**

En nuestro ordenamiento, es norma básica que las conclusiones de derecho son revisables en su totalidad por el Tribunal de Apelaciones y, de ser el caso, por el Tribunal Supremo. *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 857 (2013). Ahora bien, no podemos perder de perspectiva que "nuestro esquema probatorio está revestido por un manto de deferencia hacia las determinaciones que realizan los juzgadores de primera instancia en cuanto a la prueba testifical que se presenta ante ellos" *Pueblo v. Toro Martínez, supra,* pág. 857. Después de todo, la tarea de adjudicar credibilidad y determinar lo que realmente ocurrió depende en gran medida de la exposición del juez o la jueza a la prueba presentada, lo cual incluye, entre otros factores, ver el comportamiento del testigo mientras ofrece su testimonio y escuchar su voz. *Pueblo v. García Colón I,* 182 DPR 129, 165 (2011); *Pueblo v. Cabán Torres, supra,* pág. 654. Conforme a lo anterior, nuestra más Alta Curia ha expresado que:

> [...] no sólo habla la voz viva. También hablan las expresiones mímicas: el color de las mejillas, los ojos, el temblor o consistencia de la voz, los movimientos, el vocabulario no habitual del testigo, son otras tantas circunstancias que deben acompañar el conjunto de una declaración testifical y sin embargo, todos estos elementos se pierden en la letra muda de las actas, por lo que se priva al Juez de otras tantas circunstancias que han de valer incluso más que el texto de la declaración misma para el juicio valorativo que ha de emitir en el momento de fallar; le faltará el instrumento más útil para la investigación de la verdad: la observación. *Ortiz v. Cruz Pabón,* 103 DPR 939, 947 (1995).

Al amparo de esta premisa, el foro primario es quien tuvo la oportunidad de ver y observar la manera de declarar, de apreciar sus gestos, titubeos, contradicciones, manierismos, dudas,

vacilaciones y, por consiguiente, de ir formando gradualmente en su conciencia la convicción en cuanto a si dicen la verdad. *Pueblo v. García Colón I,* 182 DPR 129, 165 (2011).

Así pues, como regla general, un tribunal revisor tiene vedado intervenir con la adjudicación de la credibilidad de los testigos, [...] a menos que, el foro primario haya actuado movido por pasión, prejuicio, parcialidad o error manifiesto en su adjudicación. *Pueblo v. García Colón I, supra,* pág. 166. Es decir, el foro revisor, podrá intervenir ante aquel juzgador que actuó movido por inclinaciones personales de tal intensidad que adoptó posiciones, preferencias o rechazos con respecto a las partes, sin importar la prueba recibida en sala. *Dávila Nieves v. Meléndez Marín,* 187 DPR 750, 2013. Por lo tanto, la facultad de los tribunales apelativos para sustituir el criterio de los tribunales de instancia se reduce a aquellas circunstancias en las que, a la luz de la prueba admitida, no exista base suficiente que apoye su determinación". *Santiago Ortiz v. Real Legacy et al.,* 206 DPR 194, 220 (2021).

### III.

Por estar relacionados, procedemos a analizar los dos señalamientos de error de manera conjunta. En síntesis, el apelante sostiene que erró el foro primario al determinar que era culpable de todos los delitos imputados, pues, no se demostró su culpabilidad más allá de duda razonable, ni se derrotó la presunción de inocencia. Alega, además, que los testigos del Estado carecían de credibilidad, fueron impugnados y sus testimonios no fueron corroborados. Adujo, también, que la identificación con el acusado y conexión con el delito estuvo basada en el testimonio del Menor AVR y la Menor AVR -II-, en donde las autoridades investigadoras no tomaron las providencia de corroborar sus alegaciones tomando en cuenta que, por su corta edad y tratándose de la muerte de su madre pudieran estar influenciados. Sostuvo, además, que los

hallazgos de la patóloga no coinciden con que la víctima hubiera sufrido una lesión en el área del rosto. Por último, señaló que, la manera en que se trabajó la escena no es compatible con lo declarado por los testigos. *No le asiste razón.*

En su testimonio el Menor AVR, declaró que vivía en el Residencial El Carmen con el apelante, su madre y sus hermanas. Agregó que, se mudó a casa de su abuela por problemas en la relación de su mamá y el apelante. Además, arguyo específicamente en su testimonio, que había maltrato, como "halones de pelo". Añadió que, observó dicho maltrato cuando vivió en el Residencial El Carmen y el día que él la mató".

Por su parte la Menor AVR-II- testificó que, "su mamá había dejado de Christian y él no la quería".

Por otro lado, la señora Torres, testificó que, previo a los hechos, realizó una llamada telefónica con el apelante. En la cual, éste, le indicó en múltiples ocasiones que iba a matar a la señora Rodríguez por "puta".

En lo pertinente al día de los hechos, el Menor AVR declaró que, el Apelante se asomó por la ventana, tenía un arma de fuego color negra y apuntando a su mamá, le dijo "esto te va a pasar por puta". Acto seguido, entró a la casa, por la puerta, mediante fuerza. Además, detalló que, se quedó en la puerta y pudo ver a través del cristal, cuando el apelante golpeó a la occisa con el arma en la cabeza, la sacó a la fuerza de la casa y le disparó entre 8 a 10 ocasiones, en el área de los muslos.

Por último, el Menor AVR, aseguró que el apelante, una vez culminó de dispararle a su mamá, salió corriendo de la propiedad en un vehículo Yaris azul chocado. Aseguró que, conocía el vehículo porque ¨era el carro de ¨Christian y se había montado en varias ocasiones¨.

Por su parte, la Menor AVR-II- declaró que, observó al apelante, apuntar a su mamá con un arma, a través de la ventana. Relató que, el apelante se llevó a su mamá afuera, en específico al área de las plantas, ahí le disparó a su y, ésta, cayó al suelo. Aseveró que, la señora Rodríguez tenía balas en el área de las piernas y un paño rojo en la pierna derecha para no botar sangre. Por último, testificó que, la última vez que vio a su mamá fue cuando se la llevaron.

Conforme a la normativa jurídica expuesta, la edad del niño no es impedimento para testificar, siempre y cuando su testimonio sea inteligible y comprenda su obligación de testificar la verdad. Así lo demuestra la Regla 601 de Evidencia, 32 L.P.R.A. Ap. VI, R. 601. Además, es norma reiterada que, la persona testigo deberá declarar sobre la materia de la cual tenga conocimiento personal. 32 L.P.R.A. Ap. VI, R. 602. Sin embargo, su declaración en forma de opiniones o inferencias se limitará a aquéllas que, ¨estén racionalmente fundadas en la percepción de la persona testigo¨. Regla 702. 32 L.P.R.A. Ap. VI, R.701¨.

En el ejercicio de examinar minuciosamente el legajo apelativo, así como los autos originales del caso, particularmente, la *Exposición Narrativa de la Prueba Oral,* nos percatamos que, el Menor AVR y la Menor AVR-II- fueron testigos oculares el día de los hechos. Ambos presenciaron, cuando el apelante entró a la casa de la occisa, tenía una pistola y apuntó, a ésta, a través de una ventana. Observaron que, le disparó a su mamá, en múltiples ocasiones, y por último, salió corriendo de la escena. De otra parte, surge de la *Exposición Narrativa de la Prueba Oral,* que ambos testigos tenían la capacidad de entender a cerca de lo que iban a declarar, por lo cual, detallaron específicamente qué sucedió, el 29 de marzo de 2020.

Por otro lado, del expediente no se desprende que, el foro apelado o la defensa, hayan cuestionado la capacidad o credibilidad

de los menores, en cuanto, al deber de testificar la verdad. Al contrario, de una simple lectura de sus testimonios, percibimos que, a todas las preguntas que, realizó el Pueblo de Puerto Rico y la defensa, cada menor, la contestó de forma específica, detallada y constante, según su edad, y lo percibido por ellos, el día de los hechos.

Ante ello, colegimos que ambos menores tenían la capacidad de ser testigos, aun, cuando lo testificado, versó a cerca de la muerte de su mamá.

Adicionalmente, cabe destacar que, el TPI tuvo la oportunidad de evaluar otros factores determinantes en los testimonios y la documentación que desfiló, como prueba en el juicio. En específico, el Menor AVR y la Menor AVR-II- detallaron que la occisa recibió balas en el área de los muslos. Aspecto que, fue corroborado por el foro primario a través del testimonio de la Dra. Rodríguez, quien declaró que la herida B fue localizada en el área anterolateral del muslo derecho y la herida C, en la pierna derecha. Además, el Agente Lugo, testificó a cerca de los *Exhibits* B13, B16 y B23, en los cuales detalló, a cerca, de las heridas en el muslo y la pierna derecha.

Por otra parte, el Menor AVR declaró que el apelante golpeó a la occisa en el área de la cabeza con el cargador de la pistola. Hecho que fue corroborado, a través del testimonio de la patóloga, la Dra. Rodríguez, quien detalló que la occisa tenía un sangrado subgaleal. El cual, explicó, es un signo compatible a contacto con un objeto. La Dra. Rodríguez, puntualizó que, no se puede descartar que la occisa tuvo contacto con un objeto o una mano, aun cuando no hubo daño o fractura craneal.

Por último, el Agente González Quiñones, declaró que, al llegar a la escena, corroboró la información del Menor AVR, quien, indicó que observó los hechos desde el cristal de la puerta. El Agente González Quiñones, expresó que, corroboró la visibilidad desde el

ángulo de la puerta hasta el vehículo y el área de la grama, lugar donde cayó la occisa[76].

Así pues, en virtud de la prueba presentada en sala. Es menester destacar que, el foro primario, al ponderar las circunstancias prospectivas, concomitantes y retrospectivas de los hechos, dentro de un análisis integral de las circunstancias lógicas, razonables y derivadas del caso, estableció la culpabilidad del apelante más allá de duda razonable. *Pueblo v. Ortiz Rodríguez, supra,* págs. 979, 981-982

De igual manera, cabe señalar que, la declaración de un testigo que merezca entero crédito a un juzgador es prueba suficiente de cualquier hecho. Así pues, el testimonio, de éste, de ser creído puede ser suficiente en derecho para sostener un fallo condenatorio aun cuando dicho testimonio no fuera perfecto. Regla 110 (d) de Evidencia, *supra.*

Por todo lo cual, en ausencia de pasión, perjuicio, parcialidad o error manifiesto, nos abstenemos de intervenir con la apreciación de la prueba de cargo, creída por el foro primario.

Así evaluado el expediente ante nuestra consideración, los autos originales del caso y la *Exposición Narrativa de la Prueba Oral*, resolvemos que corresponde confirmar la *Sentencia* apelada.

## IV.

Por los fundamentos expuestos, confirmamos la *Sentencia* emitida, el 4 de noviembre de 2022, mediante la cual se condenó al señor Christian Rodríguez Rivera a una pena de 143 años de reclusión por los delitos tipificados en los Artículos 93(B) y 195(A) del Código Penal, *supra,* los Artículos 6.05 y 6.14 de la Ley de Armas, *supra*, el Artículo Art. 59 de la Ley con el Maltrato a Menores, *supra*, el Artículo 3.2 (D) de la Ley de Violencia Doméstica, supra, y el

---

[76] Exposición Narrativa de la Prueba Oral, pág. 44, líneas 19 – 26.

Artículo 6.14 (D) de la Ley de Seguridad Pública de Puerto Rico, *supra.*

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones. La jueza Romero García concurre, sin opinión escrita. El juez Monge Gómez entiende que procede la confirmación de la *Sentencia* apelada, sin embargo, por no estar de acuerdo con el lenguaje utilizado, concurre.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones